SAM PUTERMAN,

*Plaintiff and Respondent,*

vs.

SARAH PUTERMAN,

*Defendant and Appellant.*

(No. 2425; April 18th, 1949; 205 Pac. (2d) 815).

For Plaintiff and Respondent the cause was submitted on the brief and oral argument of Carleton A. Lathrop of Cheyenne, Wyoming.

For Defendant and Appellant the cause was submitted on the brief of John C. Pickett and Clarence A. Swainson, both of Cheyenne, Wyoming and Irving I. Oxman of Denver, Colorado and oral argument by Mr. Pickett and Mr. Swainson.

## OPINION

RINER, Chief Justice.

The District Court of Laramie County declined to open a default judgment in favor of the husband Sam Puterman in an action wherein the latter was plaintiff and his wife, Sarah, was defendant. Both parties are of Jewish nationality and will be hereinafter usually referred to as "plaintiff" and "defendant." The petition in the action filed September 12, 1947 alleged as a

ground for the divorce "that the defendant has offered the plaintiff such indignities as to render plaintiff's condition intolerable." The judgment aforesaid was rendered upon personal service of process on the defendant and found generally in favor of the plaintiff; that the plaintiff and defendant were married in Denver, Colorado in November, 1932; and that no children have been born as the issue of said marriage. The judgment following these findings simply dissolved the bonds of matrimony between the parties and granted plaintiff an absolute divorce from defendant. This judgment contained nothing regarding alimony either temporary or permanent or concerning a settlement of the property rights of the parties between themselves or an approval thereof by the Court. It was rendered October 20, 1947.

A little over a month and a half later and at the same term of court during which it was passed and on December 9, 1947, the defendant, through counsel filed her "Motion to Open Judgment and Permit Defendant to Appear and Defend." Summarized briefly this motion sought an order opening the judgment above mentioned on certain alleged grounds described as follows: That on September 12, 1947 the summons together with a copy of the petition in the action aforesaid was handed to the defendant by a deputy sheriff of Laramie County; that defendant was a person sixty-eight years of age, unable to read, speak, or understand the English language; that when these papers were served, the defendant was living with plaintiff and they were delivered to plaintiff thereafter by the defendant; that defendant did not understand the nature of these proceedings and they were not explained to her by the plaintiff; that defendant continued to live with plaintiff as husband and wife after the service of process as stated above; that during this time the plaintiff retained the papers thus served and concealed

same from the defendant; that defendant did not know that the purpose of the action was to obtain a divorce from her by the plaintiff.

That prior to the institution of the action, plaintiff took the defendant to the office of plaintiff's attorney for the purpose of executing a purported settlement and agreement; that a property settlement agreement was prepared by plaintiff's attorney and was presented to her for signature without her being then represented by counsel; that defendant was not able to read this instrument and it was not translated to her in any language she could understand; that she was told by plaintiff to place her mark upon said instrument as her signature, a copy of said instrument being attached to the motion aforesaid, made a part thereof, and marked "Exhibit A." That this agreement required that plaintiff should pay to the defendant the sum of $1,500 provided that a religious or Jewish divorce was commenced and completed so far as the parties could go within thirty days after the date of said agreement; that in the event such a divorce was not completed within said time, the agreement should be null and void and of no effect; that no Jewish divorce was obtained within the thirty days or at any time by said parties and by the terms of said property settlement agreement, the same became null and void prior to the time that the default decree herein was entered.

That defendant did not file an answer to plaintiff's petition as by law required and a default decree was entered by said court on the twentieth day of October, 1947 wherein no property rights of the parties were settled; that at the time these parties were married they were without money or property except certain household goods owned by the defendant; that during their married life they accumulated by their joint efforts money and property believed by defendant to be

of the value of $75,000; that defendant in the event a divorce is granted, is entitled to have an equitable division of the property made by the court; that when the action aforesaid was commenced, the defendant was old, in poor health, inexperienced in business matters and did not understand court procedure; that plaintiff, knowing this, wrongfully and with intent to defraud, caused the action aforesaid to be instituted, kept defendant in his home while the action was pending, living together as man and wife until said decree was given; that defendant did not know that the decree in the action had been granted October 20, 1947 and continued thereafter to live with plaintiff as his wife until about November 1, 1947 when plaintiff took defendant to Denver and talked to two Jewish Rabbis thereby attempting to secure a Jewish divorce but without success; that then the defendant's children (by a former marriage) who were living in Denver were notified by these Rabbis as to what had occurred in this proceeding; that defendant continued to live with plaintiff as his wife until November 8, 1947 when plaintiff took the defendant to Denver and left her in front of the home of one of her daughters. That the within action and the property settlement was dominated and controlled by plaintiff and his counsel and defendant was not at any time represented by counsel; that plaintiff obtained said decree through fraud and deceit, and that in equity and good conscience the defendant should be given an opportunity to defend said action, to have a trial on the merits thereof and to have an equitable division of the property of the parties made in the event a divorce should be granted to either. The motion aforesaid was supported by an affidavit of the defendant attached to said motion and marked "Exhibit B."

The agreement, "Exhibit A" above mentioned dated September 10, 1947 signed by plaintiff and his wife,

Sarah, by her witnessed mark, after reciting that the parties intend to live apart as they can not possibly live together as husband and wife due to differences between them and that they desire to settle all questions as to their respective property rights between themselves and are fully aware of each others financial condition, states that they agree (the plaintiff Puterman being designated as "party of the first part" and defendant Sarah as "party of the second part") as follows in paragraph numbered "1," to quote it verbatim:

"Party of the first part does hereby covenant and bind himself, his estate, his heirs, executors and administrators to pay to the second party the sum of Fifteen Hundred Dollars ($1,500), said sum to be paid to second party by first party at such time as a religious divorce may be granted upon an application by either of said parties to any authorized orthodox Rabbi of any orthodox Jewish Synagogue for a religious divorce; it being of the essence of this agreement that a religious divorce and such Jewish divorce shall be commenced and completed so far as these parties can go within thirty (30) days from the date hereof, and that in the event said Jewish divorce is not completed within said time, this agreement shall be null and void and of no effect."

Paragraph No. 2 in said agreement is also verbatim herewith given:

"The second party does by these presents agree to accept the said sum of $1,500 as and for and in full settlement of her right and claim in and to any interest in the community property of herself and the first party, and in full settlement of her right and claim to alimony, support and maintenance from the first party, and it is expressly understood and agreed that in the event the terms and provisions of this agreement are fully carried out by said first party, the second party does accept the payment of the money herein specified in full settlement of any right and claim she may have against said first party, or his estate, and in full settle-

ment of any interest she may have as his wife for alimony and support and maintenance."

The third paragraph of the agreement states that each renounces any claim to any property "either of said parties may now have or may hereafter acquire" after the date upon which the terms of this agreement are fully carried out.

The affidavit of the defendant, "Exhibit B" above mentioned, reiterates in large measure the statements made in the motion to open the default judgment as they have been for the most part outlined above. It also alleges that subsequent to their marriage the parties moved to Cheyenne where plaintiff engaged in the junk business which he has carried on with defendant's assistance, the business in recent years being profitable and again quoting verbatim:

"Sam Puterman has accumulated a substantial amount of money and property; that this affiant *believes* that the value of this money and property is between $50,000.00 and $75,000.00." (Italics supplied).

The affidavit also states in substance that she did not know the purport or effect of the aforesaid property settlement or the proceedings for a civil divorce; that she had no one to advise her properly and that:

"she would not have signed the agreement if she had been advised that it was for the purpose of settling all her rights to a property division and to alimony and support money; that she would have consulted an attorney to defend the civil action for divorce had she been advised that such a suit was pending which did not equitably divide the property of the parties and make arrangements for her support.

"That this affiant has a defense to the above-named action, and desires to be allowed to answer in said suit and to set up her claim for an equitable division of the property of the parties.

"That the foregoing has been translated to affiant, and she understands the statements made."

This affidavit was signed by defendant by means of her mark in the presence of the notary administering the oath to her, her daughter and her daughter's husband and a Mr. Oxman, a Jewish attorney at law in the City and County of Denver, Colorado. It was explained to her in the Jewish language by her relatives just mentioned, and Mr. Oxman, one of her counsel in connection with the motion above described also read it over to the defendant in the Jewish language. The affidavit was dated November 28, 1947.

The matter was heard by the court upon the motion above described and its supporting affidavit briefly review above and also upon additional oral testimony submitted by both parties on April 12, 1948.

Upon the following day the court entered an order denying the motion of the defendant to open the judgment and permit defendant to appear in and defend the action to which order defendant reserved her exception. That is the order now before us for review. The assignments of error are substantially that the order of court overruling defendant's motion to set aside the judgment and permit her to appear and file an answer is contrary to law and not sustained by the evidence introduced in said action.

We have already reviewed the defendant's motion and affidavit in support thereof and will now examine the material portions of the oral testimony submitted in the District Court which we regard as necessary to be considered in order to make a proper disposition of this case.

The plaintiff was called for cross examination under the statute (W. C. S. 1945, Section 3-2604) and testified in part substantially as follows: That he and the defendant were married in Denver, Colorado in 1932; that they moved to Cheyenne shortly thereafter and he engaged in the junk business; that he owns the

business; that his wife stayed in the house at 1106 W. 21 St., his place of business and his home; that he never had a fight with her; that she can't write and is not able to read English much; that she speaks and understands English; that he took her to a doctor to determine if she was all right mentally who said she was all right; that he took her to the doctor because she never cooked for him and wanted to stay with her children all the time; that he took his wife to his attorney's office as she wanted $1,500 and a divorce; that he did not read the contract prepared by his counsel to her in Jewish as he (plaintiff) can't read in Jewish; that plaintiff could not sign her name. She put a cross; that the divorce suit was filed a couple of days later; that the sheriff gave her the papers for the divorce; that plaintiff was home then; that he doesn't know what defendant did with the papers; that about November 1, 1947 plaintiff gave her son and son-in-law a copy of the agreement, that's all. To the question "didn't you also give them the summons" the plaintiff answered "I gave them something." Plaintiff also said that defendant was there in the house after plaintiff had the divorce; that defendant lived in separate room all the time that this divorce was pending, same as always; that she was supposed to get a check for $1,500 if she will give plaintiff Jewish divorce; that defendant was living in the house when divorce was granted; that plaintiff tried in Denver and in Kansas City to obtain a Jewish divorce without success but finally obtained it in Pittsburgh, Pennsylvania, through the aid of one Rabbi Krash who formerly lived in Cheyenne but at the time the Jewish divorce was granted, lived in New Castle, Pennsylvania; that the defendant never had a lawyer, she didn't need a lawyer if she wanted $1,500; plaintiff gave her the $1,500; that after going to Pittsburgh and obtaining the Jewish divorce, plaintiff took defendant to Denver, left her outside her daughter's

home and on its porch and then gave her the check for $1,500 about November 8, 1947; that defendant can not write; that the check was made out the same day the civil divorce was given, October 20, 1947; that plaintiff has not much property—just the property he lives in; that he has two lots of land; that he has a couple hundred dollars worth of junk; that plaintiff has a $7,000 mortgage; that he has about $800 in the bank; that the $1,500 check has never been cashed; that plaintiff has paid nothing for her support since she went to Denver; that she put the check in her hand bag; that defendant is not supposed to get a copy of the Jewish divorce, plaintiff got a copy; that defendant used to go to Denver every three weeks, two weeks, or a week.

William P. Mayer, the Jewish Rabbi stationed at Cheyenne called as a witness for the defendant stated that he is familiar with the procedure in Jewish divorces and that each of the parties gets a certificate; that the divorce remains with the Rabbi who grants it; that the defendant was present when the Jewish divorce was granted; that

"According to the Jewish law the husband grants a divorce for the wife. You see a wife cannot ask for a divorce, a husband gives a divorce according to the biblical law that we live up to. 'He shall write unto her a book of divorcement.' We live up to that verbally. He Sam granted the divorce to her, give the divorce to her. The woman may be present. There are certain cases where a woman must not be present. She can't get a divorce. He can get a divorce for her and seek a divorce too";
that the woman can not get a Jewish divorce if she does not want it; that "we do not grant divorces now."

Defendant testified through an interpreter, Rabbi Mayer, that her name is Sarah Shaer; that she signed an agreement with "little X"; that she did not know

what was contained in that agreement; that she knows she is in court. To the query "What city" she replied "Vilna." On cross examination of the defendant these questions were asked by counsel and answered by her as follows:

"Q. What did you think you were signing in my office when you put your mark on the paper?
"A. She knows that was the end because he told her in a few words.

"Q. Did you understand that your husband was going to file for a divorce and that you were to get $1,500 as a full property settlement?
"A. I didn't take anything of him, it is by him.

"Q. Why did you put your mark to the agreement?
"A She was forced so she made a little mark.

"Q. Who forced you to make it?
"A. She don't know. There were four men. I don't know who it was.

"Q. Did you know you were to get $1,500?
"A. He gave it to me. I took it.

"Q. Had you had any conversations with Mr. Puterman before this time with reference to a property settlement?
"A. I don't know what it's going to be. I know what it was.

"Q. Do you recall me reading the agreement to you before you signed it?
"A. He did not read any for me.

"Q. Do you recall anything being said at that time about receiving $1,500?
"A. The money is not by me, it's in the bank."
that she does not know Mr. Oxman her Jewish attorney; to the query: "You have stated that your husband is worth from fifty to seventy-five thousand dollars. How did you know this?" She answered: "It is a lie." Her meaning in making that answer is not clear. The

affidavit she filed stated only that she *"believes"* that the value of his property was of these stated amounts. It was not a direct statement that she knew the value was those several amounts. On redirect examination she answered these questions thus:

"Q. Do you understand English?

"A. She doesn't know. Well, she is able to understand and able to talk—forgets quite a bit.

"Q. Can you read English?

"A. English, now."

William Shaer, plaintiff's son, thirty-two years old, residence, Denver, a traveling salesman, stated as a witness for the defendant that when they were married plaintiff had a broken down Model T Ford and his personal clothes; that defendant had about five rooms of furniture which she took to Cheyenne; that she can not read or speak English and talks to her relatives in the Jewish language; that he saw plaintiff and defendant on a visit the early part of October and nothing was said about a divorce; that the last part of October after witness had learned plaintiff had started divorce proceedings, he and his brother-in-law, Albert Rosenbaum called on defendant at 1106 W. 21st St. in Cheyenne; that plaintiff was living at the same address; that they asked plaintiff if defendant had been served her divorce papers and he told them someone from the sheriff's office came and read her the divorce proceeding and gave her a court summons; that plaintiff got the papers from his drawer in his room and turned them over to them; that Shaer asked him if she had ever had the papers. He said "she couldn't read anyway," so he just kept the papers and he produced them; that witness would come to see his mother and she didn't even remember his name; she knew that he was one of her boys but which one she didn't remember and he would have to tell her; that this condition has pre-

vailed the last couple of years; that his mother has been living with his sister in Denver; that during the past fifteen years her visits at Denver averaged twice a year; that plaintiff told Shaer his mother was crazy; that Shaer took his mother to Dr. Bunton in Cheyenne at plaintiff's suggestion and the doctor said that she was not crazy, no crazier than plaintiff was.

On cross examination Mr. Shaer said that his mother talks very little English; that counsel and witness could not understand her; even the witness could not, and he is her son; that his mother only partially understands what she does; that as to the affidavit his mother signed, witness thinks that she did not know too much what she was signing.

On redirect examination he stated that she (his mother) would understand it better if read to her in Jewish than if it was read to her in English; that his mother's mind has a tendency to wander as was noticed in her testimony given in court that day; that it would have to be "more or less pounded into her even in Jewish"; that he has noticed this condition prevailing the last two or three years.

The daughter of defendant, Mrs. Albert Rosenbaum, testified as a witness for the defendant that she did not know her mother was coming to Denver when plaintiff brought her down the last time; that she does not know whether her mother knew about the check at the time or if she just forgot; the check was in her mother's purse, nothing else there; that her mother didn't have a penny in her pocket book; that when she usually came that way plaintiff gave her just enough for fare —that is all; that witness was present when her mother signed the affidavit in this case; that the affidavit was explained to their mother in the Jewish language by her brother and herself; that Mr. Oxman read the entire affidavit to defendant in Jewish and her mother

understood him better because he speaks in that language better than she or her brother does; that her mother says one thing at one time and forgets it a little later on and that she does that quite often; that witness and her husband have been taking care of her mother; that plaintiff has not provided any of the necessities for her; that recently her mother came to visit her every three weeks but did not stay long.

On cross examination this witness said that she was not interested in plaintiff's money but that she wants to take care of her mother and she thinks plaintiff should help witness take care of her.

For plaintiff, his counsel went on the witness stand and stated under oath as follows:

"Shortly prior to September 10, 1947, Mr. Sam Puterman consulted me with reference to a divorce. He stated that he and his wife had agreed on a property settlement whereby he was to pay her $1,500; that she did not want to live with him, kept going to Denver all the time and did not keep up the house. I prepared the property agreement, a copy of which is in the files in this case.

"On September 10, 1947, Mr. Puterman and Mrs. Puterman came to my office. This was the first time I had ever seen Mrs. Puterman and I do not believe I have seen her until today. I gave her a copy of the agreement that was prepared and read it entirely through. After reading it, I asked her if, as near as I can recall, if she understood that she was going to get $1,500 in full settlement of her property rights. As near as I can recall, she shook her head yes and said, "He no good," pointing to her husband who was across the table from her. She was sitting in a chair next to me. I mentioned to her the fact of a divorce. I thought she understood what I was saying to her. Her conduct— the only part, I can recall her saying, "He no good," and pointing to her husband. I then called in Walter Gowen, who has an office right next to mine in the insurance business of C. N. Bell. The parties both sign-

ed. Mr. Puterman signed his name, Sarah Puterman signed her mark which I have here in my possession. We witnessed the mark."

On cross examination this witness stated that he was representing the plaintiff; that there was no separate representation for defendant at any time; that witness knew from his client that defendant had been taken to Dr. Bunton and that the latter, he believes, said she was all right; that the property settlement agreement was not filed in the divorce proceeding prior to the decree; that it was "probably mentioned in court"; that witness has the original in his possession. Plaintiff on direct examination in his own behalf stated that after the divorce action was filed he never lived with his wife as husband and wife but each lived in a separate room; that plaintiff does not have fifty or seventy-five thousand dollars; we used to be worth that years ago, in Pueblo, not here in Cheyenne; that no one forced defendant to sign the agreement; that at that time defendant said: "I don't want no more husband. He is no good. I want to stay with the children. I want a divorce"; that defendant told plaintiff she wanted $1,500 clear in a property settlement; that he did not conceal the divorce papers; that she had them in her room; that when the sheriff told defendant about the divorce papers she said "all right"; that defendant wanted a divorce.

On cross examination plaintiff said that he didn't want a divorce, she wants it; that he paid Rabbi Krash $150 for the Jewish divorce; that he had about $3,000 when he married the defendant; she had nothing; that the furniture she had is still there. She can take it. He doesn't care about it; that defendant worked for plaintiff all their married life; that defendant cleaned house before she continually wanted to go to Denver; that defendant told plaintiff "I'm getting too old; I'm going to live with the children."

It has been extremely difficult to supply an adequate interpretation of plaintiff's broken English replies to the questions put to him by both his own counsel and counsel for the defendant. We have done the best we could in endeavoring to understand what was meant by the testimony given by these parties. The brief testimony of the defendant also indicates, as we think, that there is grave doubt if she understood what was transpiring at the time she affixed her mark to the so-called property settlement agreement or during the time the default divorce was being obtained. A person in her situation, aged, mentally disturbed, without knowledge of the English language, only imperfectly comprehending what was said to her in her native Jewish tongue and wholly ignorant of court procedure should have had the benefit at all these times of intelligent and competent legal advice. It is a conceded fact that this woman, closely approaching the allotted three score and ten years, never at any time until the motion herein was prepared and filed was separately represented by counsel. She should have been so aided. But, as her husband testified, he thought she did not need the help of a lawyer at any time. He seems to have controlled these matters entirely. We are inclined to think that plaintiff misled his own counsel to believe that the defendant was quite able to understand what was said to her in English and comprehend the property settlement agreement as made and the divorce proceedings in court as well as the plaintiff himself did. His counsel never saw this woman but the one time when she signed the agreement by her mark. The record is barren of any explanation of her condition to plaintiff's counsel given by plaintiff, and counsel was merely told that she had been taken to a doctor who said she was "all right." We consider this was not enough under the circumstances disclosed by the his-

tory of what has occurred between these parties both out off and in court.

It would appear that plaintiff practically disregarded his wife's condition and by his conduct in that respect committed a fraud upon her rights concerning the property accumulated by the parties during their marriage. That property appears to be entirely in the hands of the husband. He seems to be reasonably acquainted with business methods, and appears to have supervised everything that was done in the matter of endeavoring to sever the marriage bond between him and Sarah, his wife. We reach the conclusion that after the defendant had spent fifteen years of her life in plaintiff's home, keeping plaintiff's household affairs running, doing all the necessary tasks, cooking and cleaning in connection therewith, that she was entitled to have the services of a lawyer and the independent judgment of the court after a full and fair presentation of this case on behalf of both parties relative both to the merits of a divorce and to an equitable property settlement as between them.

We are confirmed in these views by an examination and study of the following authorities among others: Recalling that the motion to set aside the default judgment was made at the same term of court at which it was entered it may not be inappropriate to note an elementary legal principle referred to by this court in Sioux City Seed Co. vs. Montgomery, 42 Wyo. 170, 291 Pac. 918 in this language:

"Now, a court has full control over its orders or judgments during the term at which they are made, and may, in the exercise of its discretion, amend, correct, open or vacate them. McGinnis v. Beatty, 28 Wyo. 328, 204 Pac. 340; 34 C. J. 207. This power is derived from the common law, and exists independently of any statute. The judgment may, during that time, be set aside on the court's own motion or upon the motion of an

interested party. The form of the motion is not of importance. Thus it has been held that it may be oral."

This principle was reiterated in Shaul vs. Colorado Fuel & Iron Co., 46 Wyo. 549, 30 Pac. 2d 478 thus:

"The order of December 31, 1931, therefore, was made during the same term in which the judgment of September 17, 1931, was entered. It is settled in this state that during the term the court has the power to set aside a judgment entered during the same term, with the restriction only that the power be exercised within a sound discretion." (Citing additional authorities).

Many courts in defining the words "abuse of discretion" as opposed to the words "sound discretion" have used substantially the language employed in the case of Detroit Fidelity & Surety Co. vs. Foster 170 S. C. 121, 169 S. E. 871 as follows: "The term 'abuse of discretion' does not mean any reflection upon the presiding judge and does not carry with it an implication of conduct deserving censure, but is strictly a legal term indicating that the appellate court is of the opinion that under the circumstances the trial judge committed error of law in the exercise of his discretion." Other definitions, of course may be found.

So in Lake vs. Lake 63 Wyo. 375, 182 Pac. 2d 824 this was said:

"The discretion above mentioned is an impartial discretion, guided and controlled in its exercise by fixed legal principles; it is a legal discretion to be exercised in conformity with the spirit of the law and in a manner to subserve and not to defeat the end of substantial justice, and for a manifest abuse thereof it is reviewable by the appellate jurisdiction."

In 27 C. J. S., 800 Section 166 it is stated:

"Since a judgment by default is not favored in divorce suits, the courts incline to open or set aside such a judgment and to give defendant a day in court so that the merits of his defense may be passed on, under such terms and conditions as to the court may seem proper;

and, accordingly, the courts construe pertinent statutes liberally, apply less rigorously strict rules pertaining to the opening of defaults, and sometimes act on a slight or vague showing or a showing sufficient to create a doubt as to the propriety of the decree."

See also 49 C. J. S. 611.

Even as to civil actions generally where a more strict and rigorous practice usually prevails, 31 Am. Jur. 265, Section 715 has this to say:

"Under the tendency of the courts to require causes of action to be tried upon the merits, judgments by default are regarded as peculiarly within the rule conferring authority on courts to open, correct, or vacate their own judgments."

So in Daly vs. Okamura et al., 25 Ariz. 50, 213 Pac. 389 where the court by its order set aside a default judgment taken against Japanese defendants, this action was held proper on plaintiff's appeal from that order. The order was made on the application or motion of defendants through their counsel to vacate the judgment. This application was supported by the attorney's affidavit to the effect:

"that in 1919 defendants had leased from Kortsen and one Laura Haigler 160 acres of farming land, and made and delivered to Kortsen the three notes sued on as part payment for the rental of the second year of such lease; that at the beginning of the second year of said lease defendants were notified and required by Haigler, who was the owner of the leased premises, to quit the same immediately, which they did; that Haigler, who had also been given notes for her part of the second year's rent, when defendants surrendered possession of the premises, canceled and returned to defendants her said notes; that the Haigler and Kortsen notes were in payment of rent for the second year of the lease; that the premises were surrendered by defendants upon the request of the lessors Haigler and Kortsen; and that the notes sued on were past due when assigned to plaintiff.

"The reason given in affidavit for the failure to answer within the time allowed by law, seems to have been the inability of the defendants and their attorney to understand each other, the defendants being Japanese with little knowledge of the English language or the laws of the country. Indeed, the attorney states in his affidavit that defendant Okamura brought to his office a copy of complaint and summons on December 5, 1921, and stated, in answer to questions, that he owed the money and had no defense."

An answer was filed after the order vacating the judgment had been made which alleged more in detail the facts above recited and that there was a total failure of consideration for the notes in suit. In ruling against the plaintiff the appellate court said:

"Upon the face of the showing, it is a plain case of neglect upon the part of defendants to take any steps to protect themselves by disclosing to counsel consulted the fact that notes had been issued for a consideration that had since totally failed. But notwithstanding this neglect, which ordinarily would have been inexcusable, we think the court very properly took into consideration, in passing upon the motion, the defendants' unfamiliarity with our laws and language. Indeed, the neglect under the circumstances might be more apparent than real, since it is possible defendants may have honestly believed themselves obligated to pay the notes to the assignee Daly, even though they had made arrangements with the payee, Kortsen, for their cancellation and return.

"However that may be, the showing exhibited a meritorious defense — one, if true, that would certainly defeat a recovery. It goes further, and shows that a recovery would be an outrage on justice and right. The liberality of the statute authorizing the court 'upon good cause shown' to set aside its judgments upon the facts shown in the record was not violated, but, we think, respected and followed, in this instance.

"By the action of the court the case stands for trial upon its merits, and this is as it should be, generally speaking. The courts uniformly exercise their discre-

tion to that end, when it appears that to do otherwise injustice will result, and such a discretion will not be set aside on appeal except in case of abuse or arbitrariness. Beebe v. Farish, 14 Ariz. 231, 127 Pac. 715; Dowdy v. Calvi, 14 Ariz. 148, 125 Pac. 873.

"In the latter case we said:

" 'The exercise of the discretion ought to tend, in a reasonable degree at least, to bring about a judgment on the very merits of the case; and when the circumstances are such as to lead the court to hesitate upon the motion to open the default, it is better, as a general rule, that the doubt should be resolved in favor of the application.' "

Where the trial court refused to vacate a default divorce judgment given in plaintiff's favor and declined to allow a defendant to interpose an answer and counterclaim, in Jermain vs. Jermain, 243 Wis. 508, 11 N. W. 2d 163 it was held that:

"For the purpose of considering motion to vacate default judgment of divorce and permit defendant to answer and counterclaim, the facts set forth in deposition of a witness in support of motion are regarded as true."

The court also said:

"It has long been recognized that the public, as well as the parties to the proceedings, has a deep interest in divorce actions. This is recognized in White v. White, 167 Wis. 615, 168 N. W. 704, 707, where the court said:

'In divorce actions, in which the state has such a substantial, well-recognized interest, a court is not confined in its disposition of them to the facts as they existed at the time of the commencement of the action merely, but it may take cognizance, under proper pleadings, of what is done by either or both parties thereto during the time it is pending before it.'

"And again in Subacz v. Subacz, 183 Wis. 427, 198 N. W. 372, 374, the court said: 'The duty of representing the interests of the public vests, not only in the

divorce counsel, but also in the court; in fact, before the passage of the statutes creating the office of divorce counsel, such entire duty vested in the court. Notwithstanding the statutes above referred to, and all of the precautionary measures contained therein, a default judgment of divorce does not stand upon the same plane as a judgment in an ordinary civil action, and the rule still obtains, in a somewhat modified degree, that a default judgment of divorce will be vacated upon slight showing. * * * ' "

See also Kilmer vs. Kilmer 249 Wis. 41, 23 N. W. 2d 510.

In Smith vs. Smith, 64 Cal. App. 2d 415, 148 Pac. 2d 868 where the trial court granted defendant's motion to set aside a default judgment by which the plaintiff was given an interlocutory decree of divorce, on plaintiff's appeal therefrom, in affirming this order this was said:

"But in divorce actions courts look with special favor upon applications for hearings on the merits. In a divorce action if an application for relief be made in due time the court is justified in setting aside a default 'upon very slight showing'. Hammond v. Hammond, 92 Cal. App. 212, 267 P. 893, 894; Rehfuss v. Rehfuss, 169 Cal. 86, 145 P. 1020. This rule is based upon the ground that the state is interested in preserving the integrity of the family relation, which cannot be destroyed merely by the consent of the parties."

In Price vs. Price, 240 N. Y. S. 29 the Appellate Division of the Supreme Court reversed an order of the court below denying defendant's motion to open her default in a divorce matter and directed that her motion be granted. On the point the court said:

"The rule in respect to opening defaults in ordinary actions is not to be applied so rigorously in a matrimonial action. Mott v. Mott, 134 App. Div. 569, 574, 119 N. Y. S. 483. The defendant adequately· excused her default, and the facts shown in the record required that her motion be granted especially in view of the state's interest in the marital status."

The trial court in Hartle vs. Hartle, 184 S. W. 2d (Mo. App.) 786 entered an order refusing to set aside a default judgment granting plaintiff a divorce. On defendant's appeal from this order the reviewing court reversed the action of the court below and said in part:

"Where a motion to set aside a default judgment is filed during the judgment term, the trial court has a wide discretion in setting aside the judgment, and when the trial court sets the judgment aside the appellate court is less likely to interfere than when the motion is denied. The purpose of all courts is to do justice, and to that end it is the policy of the courts to try cases on their merits when it can be done without working injustice or too great hardship to one or the other of the parties. The Supreme Court has many times stated and enforced the rule that large discretion rests with the trial court in acting on motions to set aside default judgments, and that it is less apt to interfere with such discretion where the judgment is set aside than where it is not, and the reason for this is that when the judgment is set aside the case is yet open and justice will yet be done. And it has been said that when the motion to set aside a default judgment discloses a meritorious defense and it is apparent to the appellate court that no hurtful delay will result from directing the trial court to set the judgment aside, it should be done unless the party in default has been guilty of such gross negligence as to preclude him from favorable consideration of the court. Karst v. Chicago Fraternal Life Ass'n, Mo. App., 22 S. W. 2d 178, loc. cit. 181; Tucker v. St. Louis Life Ins. Co., 63 Mo. 588; Hall v. McConey, 152 Mo. App. 1, 132 S. W. 618; Harkness v. Jarvis, 182 Mo. 231, 81 S. W. 446; Anspach v. Jansen, 229 Mo. App. 321, 78 S. W. 2d 137; Crown Drug Co. v. Raymond, Mo. App., 51 S. W. 2d 215; Parks v. Coyne, 156 Mo. App. 379, 137 S. W. 335; Perkins v. Travis, Mo. App., 194 S. W. 730; Iron Mountain Bank v. Armstrong, 92 Mo. 265, 4 S. W. 720; Doan v. Holly, 27 Mo. 256.

"In Perkins v. Travis, supra, the court said:

" 'It being the primary purpose of courts in giving judgments to arrive at a conclusion on the merits of

the controversy, trial and appellate courts should see to it that in cases where there had been no bad faith or long delay or inconvenience or unnecessary expense caused one of the litigants, such primary purpose of courts in administering justice is enforced.'

"In Hall v. McConey, supra, the court said:

" 'The general rule is that, where the application discloses a good defense on the merits, and a reasonable excuse for delay is shown, and no substantial injury has resulted from such temporary delay, the court should exercise its discretion in favor of the trial on the merits.'

"What the court there said was quoted with approval in Parks v. Coyne, supra.

" 'We must have in mind that the principles enunciated in the foregoing cases are such as are applicable in ordinary suits involving property rights merely, whereas we are here dealing with a suit for divorce, which seeks to dissolve the marriage status. This is a matter with which the state is concerned, and the state is regarded as a party to the suit. In such suits judgments by default are especially disfavored by the courts, and strict rules pertaining to the setting aside of default judgments are less rigorously applied, and sometimes default judgments are set aside on a slight or vague showing, or a showing sufficient to create a doubt as to the propriety of the judgment. 27 C. J. 800; Cherry v. Cherry, 225 Mo. App. 998, 35 S. W. 2d 659."

In the case of Rush vs. Rush, 58 Wyo. 406, 133 Pac. 2d 366 it appeared that a divorce decree which the attorney for the husband wrongfully obtained for the wife, she not being in fact aware or advised of the true situation in the matter, did not settle property rights of the parties. The trial court which had entered the divorce decree had been incorrectly informed that property rights had been theretofore settled by an agreement between the parties. Although the husband and wife involved in the matter were at all times residents of Hot Springs County, Wyoming, but the wife

having gone for medical care to the Casper, Wyoming hospital at the time the divorce proceedings were conducted, the husband filed a waiver in the cause so that the divorce could be granted. It seems the divorce action was controlled throughout by the husband with the aid of counsel selected and employed by him alone. It also appeared in the case that the husband possessed and managed all the property which had been accumulated by the parties.

The fault found with the decree of divorce was that no permanent alimony had been adjudged by the court granting the decree and no disposition of the property rights of the parties, besides had been adjudicated. Directing that the matter should be disposed of by the court granting the decree of divorce and not by the district court of another county of this state where the action had been undertaken to be brought and had been dismissed on demurrer, it was remarked concerning the disposition of the divorce action that it:

"appears to have been controlled throughout by the defendant with the aid of the attorney selected and employed by him. That of itself was a fraud upon the rights of the wife, as it may readily be inferred that she received no unbiased and independent legal advice as to her rights concerning the property of the parties, everything being managed in the interests of the husband. The plaintiff was not a woman acquainted with business matters, but quite inexperienced therein.

"When these allegations of the third amended petition are considered with the remaining portions of the pleading, where the defendant's conduct is described and averred, we are convinced that the property rights of the wife were simply not taken up for consideration by the court due to the indefensible actions of the defendant. That they should be inquired into by a hearing on the merits, if that can legally and properly be done, is, we think, quite clear."

See also the authorities cited and reviewed in the Rush case supra in support of what was said as quoted above and also Peterson vs. Peterson, 221 Iowa 897, 267 N. W. 719, 721, 722.

In Lake vs. Lake supra it was also said:

"Judgments by default are not favored. Courts prefer that cases be tried upon the merits."

We do not pass upon the merits of the cause before us. All we undertake to do at this time is to direct that the district court see to it that both parties are accorded a full and complete hearing on the issues resulting from the filing of such an answer as defendant may be advised to file. If the rights of the defendant can not be properly protected without the appointment of a guardian ad litem (Section 7-113 W. C. S. 1945) that should be done.

The order of the District Court of Laramie County in question is accordingly reversed with directions to sustain defendant's motion and to allow the parties to have a trial on the merits of the action as they may be advised by their counsel. It is perhaps unnecessary to add that the proceeds of the $1,500 check mentioned hereinabove which appear to have been deposited in the American National Bank of Denver, Colorado to the credit of defendant's daughter's husband should be considered by that court in equitably disposing of the property rights of the parties.

The motion to dismiss filed herein by plaintiff is denied. In view of what has been previously set forth herein we do not think it necessary to discuss this matter, other than to say that we can see no elements of estoppel involved in the circumstances surrounding the delivery of this check or its deposit in the Denver bank, as the file now before us discloses. If there should be any question on the matter it can be undoubtedly

litigated when the cause is heard on its merits in the District Court.

*Reversed* and Remanded with Instructions.

KIMBALL, J. and BLUME, J. concur.