McMullan v. Wohlgemuth et al., Appellants.

564

Argued May 26, 1971. Before BELL, C. J., JONES, EAGEN, O'BRIEN, ROBERTS, POMEROY and BARBIERI, JJ.

*Harold E. Kohn* and *Douglas G. Dye*, with them *David H. Marion, Leonard Barrachk, Jonathan M. Stein,* and *Harvey N. Schmidt,* for plaintiffs.

*Marx S. Leopold,* Assistant Attorney General, with him *J. Shane Creamer,* Attorney General, for defendants.

OPINION BY MR. JUSTICE O'BRIEN, October 12, 1971:
Philadelphia Newspapers, Inc., which owns and publishes *The Philadelphia Inquirer,* John McMullan, Executive Editor of *The Inquirer,* and James Steele, a reporter employed by *The Inquirer,* all of whom will be collectively referred to as "the Inquirer" in this opinion, filed a complaint in equity against Helene Wohlgemuth, Secretary of Welfare of the Commonwealth, Clarence Jenkins, Executive Director of the Philadelphia County Board of Public Assistance, and the Commonwealth of Pennsylvania, all of whom will be collectively referred to as "the Commonwealth". The complaint sought to enjoin the Commonwealth from withholding from the Inquirer the records containing the names, addresses and amounts of public assistance of certain welfare recipients in Philadelphia, and to enjoin the Commonwealth from denying the Inquirer the right to inspect, examine, extract and photocopy the records of welfare recipients in Philadelphia. Thereafter, one Jane Doe, a welfare recipient, individually and on behalf of all others similarly situated, sought leave to intervene as a defendant. The Commonwealth Court held a hearing and took evidence on an application for a preliminary injunction. That court allowed the intervention of Jane Doe on the condition that she file an affidavit disclosing her identity and with the further stipulation that the affidavit of identity be impounded so that the name of the intervenor would not be revealed to other than authorized personnel of the court. The court also granted a preliminary injunction enjoining the Commonwealth temporarily "from withholding from [the Inquirer] a list to be prepared by the [Commonwealth] containing the names, addresses, and amounts of public assistance paid recipients in two percent (2%) of the cases in the City-County of Philadelphia, said list to be prepared by computer at the expense of the [the Inquirer]. . . ." The temporary in-

junction decree further required the Inquirer to supply the court with the names and addresses of not more than ten fulltime employees of the Inquirer, who would be the only persons to have access to the list required to be furnished, or to any of the names, addresses and amounts contained in the list. Those ten persons were the only ones permitted by the decree to investigate to determine if abuses of the public assistance program were involved in the payments shown by the list. The decree further forbade the ten employees of the Inquirer to represent themselves as employees of the Commonwealth or otherwise misrepresent their identity or purpose. In addition, the temporary injunction decree permitted the Inquirer to publish an article or articles reporting the results of its investigation, but specifically forbade the publication of any names, addresses or amounts revealed as the result of the investigation without prior approval of the court.

The Commonwealth and the intervenor appealed from the grant of the preliminary injunction, and the Inquirer appealed from the order allowing intervention, as well as the restrictions contained in the preliminary injunction as to the scope of the required Commonwealth disclosure and the restrictions on publication. We granted supersedeas on the Commonwealth's application in order that the status quo might be maintained pending disposition of the instant appeals.

The litigation at bar had its genesis in an apparently general feeling of dissatisfaction in both official and unofficial quarters with the operation of the public welfare system of the Commonwealth. The Inquirer, as well as other media of public information in Philadelphia and elsewhere in the Commonwealth, were interested, and properly so, in the various procedures being undertaken by the Welfare Department and investigations by committees of the General Assembly into the

operations of the Welfare Department as they dealt with the payment of public assistance grants to Pennsylvania residents. The Inquirer determined to make a survey of public assistance payments in Philadelphia in order to determine whether fraud existed or whether other misapplications of public funds were occurring within the system. It, therefore, requested that the Commonwealth make available to it the lists of the names and addresses of all public assistance recipients in Philadelphia and the amounts received by each. It was upon the Commonwealth's refusal to make such information available to the Inquirer, and, in fact, the Commonwealth's refusal to permit inspection of its records by the Inquirer, that this litigation was commenced.

The Inquirer argues that it is entitled to the lists of names and addresses and of amounts of public assistance paid to welfare recipients under the Pennsylvania "right-to-know" act, act of June 21, 1957, P. L. 390, §1, 65 P.S. §66.1 et seq. Section 1 of the act, 65 P.S. §66.1(2), defines public records which may be inspected and copied by members of the public as a matter of right, and that definition is clearly broad enough to encompass the records sought here. The definition, however, contains a proviso which excludes from its terms "any report, communication or other paper, the publication of which would disclose the institution, progress or result of an investigation undertaken by an agency in the performance of its official duties or any record, document, material, exhibit, pleading, report, memorandum or other paper, access to or publication of which is prohibited, restricted or forbidden by statute law or order or decree of court, or which would operate to the prejudice or impairment of a person's reputation or personal security, or which would result in the loss by the Commonwealth or any of its political subdivisions or commissions or State or

municipal authorities of Federal funds, excepting therefrom, however, the record of any conviction of any criminal act."

The Commonwealth contends that the right-to-know act does not require the disclosure of the information sought by the Inquirer. It argues that the disclosure of the names of welfare recipients would operate to impair the reputations of such recipients, and that the records, therefore, fall within the exclusionary provision of the right-to-know act. Moreover, the Commonwealth argues that since certain categories of public assistance, such as aid to families with dependent children, federal-state aid to the blind, aid to the permanently and totally disabled, and old-age assistance, are to a certain extent funded by the federal government, the Commonwealth is bound by the applicable provisions of federal law, which restrict the use or distribution of information concerning applicants and recipients to purposes directly connected to the category of aid involved in the federal funding. The Commonwealth contends that it is obligated under federal regulation to protect the confidentiality of public assistance recipients, and that to violate such confidentiality would be to jeopardize continued federal funding of such programs. The Commonwealth argues that the possibility of the loss of such federal funds also places these records beyond the reach of the right-to-know act.

The Inquirer further contends that it is entitled to these records under the provisions of the Public Welfare Code. Section 425 of the Public Welfare Code, 62 P.S. §425, provides: "Upon request by any adult resident of the Commonwealth, any county board shall furnish the address and amount of assistance with respect to persons receiving assistance about whom inquiry is made, but such information shall not be used for commercial or political purposes."

The Commonwealth argues, in essence, that Section 404 of the Public Welfare Code, 62 P.S. §404, which was enacted subsequent to the right-to-know law, limits the requirements contained in §425 set out above by granting to the Department of Welfare the right to adopt regulations "to restrict the use of information furnished to other agencies or persons to purposes connected with the administration of public assistance." The department has consistently taken the position that the names of recipients and applicants are confidential, and regulations requiring confidentiality have been promulgated by the department in its Public Assistance Manual. Section 4143.3 of its regulations forbids access to the records except by individuals who have an official connection with the Department, or who are employees of the Auditor General's office, the Treasury Department or other state or federal agencies officially charged with the administrative supervision, review, evaluation or audit of those records.

The Inquirer further contends that it is entitled to this information under basic principles of the common law. Needless to say, the Commonwealth contends that there is no common law right to such information.

The intervenors argue that disclosure of the information sought by the Inquirer would be an improper invasion of their rights of privacy and would be harmful to their reputations and standings in the community. The Inquirer contends that the intervenors have no legally enforceable interest in the outcome of the action, and that the individual intervenor has not established that she is properly representative of a class. We conclude that the individual intervenor has indeed established that she is properly representative of a class of welfare recipients and that she and those similarly situated have a legally enforceable interest in the outcome of this action based upon their interest in the prevention of invasions of their privacy. The testimony

offered by the Inquirer at the hearing below indicates that it intends to have its investigators contact welfare recipients disclosed by the list in order to effectuate its investigation of the welfare system. Such intended contacts, coupled with the disclosure of an individual's status as a welfare recipient gives him an interest in the outcome which he has a right to protect by participation in the litigation. Moreover, we are constrained to say that the Inquirer is in no way prejudiced by this intervention. If the Inquirer is entitled by law to the information which it seeks, it will gain access to that information irrespective of the intervention. If it is not so entitled, the presence or absence of the intervenors in this litigation will have no effect. The order of the court below allowing the intervention will, therefore, be affirmed.

The Inquirer further complains that the limitation of the preliminary injunction to two percent of the welfare recipients is improper and that it is entitled to all of the records. It also contends strongly that that portion of the preliminary injunction which places prior restraints on its rights of publication is constitutionally invalid, being in violation of the First Amendment to the United States Constitution. The view which we take of this case makes it unnecessary that we decide these questions at this time, although we take note of the action of the United States Supreme Court in *New York Times Co. v. United States,* 403 U.S. 713 (1971), 39 L.W. 4879, with respect to prior restraints on the publication of information in the hands of newspapers.

It has long been the law of this Commonwealth that appellate courts will not inquire into the merits of disputes on appeal from the grant or refusal of a preliminary injunction, and that we will look no further than a determination of whether reasonable grounds appear for the granting of the preliminary injunction. Even with that narrow standard of review in mind,

however, we conclude that the entry of a preliminary injunction in this case was inappropriate and must be vacated.

The threshold question which we must answer is whether the Inquirer's need for relief is so immediate or whether it has demonstrated such irreparable harm as to require the granting of a preliminary injunction. We conclude that no such showing has been made. In fact, if irreparable harm occurs, it most likely occurs from the grant of the preliminary injunction rather than its refusal. This is certainly the case as to the two percent sampling whose names, addresses and amounts of assistance will be disclosed prior to a final determination of the equity action, perhaps needlessly and unlawfully. The court below took note of this possibility in its discussion of the clarity of the Inquirer's right to relief when it said: "We would agree with [the Commonwealth] as to the insufficiency of the clarity of the right with regard to a temporary injunction if the order were to include the right to publish names. No opinion is expressed here on the right to publish names, addresses and amounts, even if 'newsworthy', until further argument is heard either on a subsequent request under the temporary injunction or on the disposition of the case on its merits." Upon final determination of the equity suit, if the Inquirer should be found to be entitled to the information sought, it may receive it then and will have suffered no irreparable harm in the delay that we can fathom. We recognize that in *New York Times,* supra, there are overtones of irreparable harm to a newspaper in the prevention of publication by it for any period of time of information which it has in its hands. Such is not the case here. The Inquirer is not in possession of information which it is prevented from publishing. The Inquirer is seeking information, and the very subject of this litigation is to determine whether it is entitled

to that information as a matter of right, by statute or otherwise.

A preliminary injunction of any kind should not be granted unless both the right of the plaintiff is clear and immediate and irreparable injury would result were the preliminary injunction not granted. *Bliss excavating Co. v. Luzerne Co.,* 418 Pa. 446, 211 A. 2d 532 (1965) ; *Albee Homes, Inc. v. Caddie Homes, Inc.,* 417 Pa. 177, 207 A. 2d 768 (1965). *Gillette Company v. Master,* 408 Pa. 202, 182 A. 2d 734 (1962), *Schwab v. Pottstown Borough,* 407 Pa. 531, 180 A. 2d 921 (1962). As indicated above, we are far from convinced that the refusal of a preliminary injunction would result in immediate and irreparable harm to the Inquirer. Moreover, the legal situation is such that the Inquirer's right to the information sought is far from clear. The legal issues raised are complex, and anything but free from doubt. The combination of the lack of clarity of the Inquirer's rights and the absence of immediate and irreparable harm militates strongly against the issuance of a preliminary injunction. In addition, where an adverse effect upon the public will result from the issuance of a preliminary injunction, it should not be granted. *Berkowitz v. Wilbar,* 82 Dauphin 357 (1964), affirmed 416 Pa. 369, 206 A. 2d 280 (1965). In that case, the court refused to enjoin the dismissal of a state employee on the ground that the importance of not interfering with the administrative function of the state government outweighed the necessity for a preliminary injunction. Here, we are loath to permit interference with the administrative function of the Department of Welfare by way of a preliminary injunction, except in a clear case. We find no such clarity in the case at bar.

In addition, the preliminary injunction granted here is to a certain extent mandatory in that it requires the Commonwealth to prepare a list containing certain

information. Mandatory preliminary injunctions should be granted even more sparingly than those which are merely prohibitory. A preliminary injunction is generally simply preventive, maintaining the status quo until the rights of the parties are determined after a full examination and hearing. In *Audenreid v. Phila. & Reading Railroad Co.*, 68 Pa. 370 (1871), we said that an interlocutory or preliminary injunction could not be mandatory. That rule, however, is not entirely without exception, but where exceptions are allowed, the rights of the plaintiff must be clear, or the defendant must change the status of the parties while the result is pending. *Fredericks v. Huber,* 180 Pa. 572, 37 A. 90 (1897), *Cooke v. Boynton,* 135 Pa. 102, 19 A. 944 (1890). We do not find in this case the exceptional circumstances which compel the granting of a preliminary injunction mandatory in nature. In *Phila. Rec. Co. v. C.-M. News, Inc.,* 305 Pa. 372, 377, 378, 157 A. 796 (1931), we said, with reference to a mandatory preliminary injunction: "This a court never grants except to prevent irreparable injury where the rights of the parties are entirely clear [citing cases], which they are not in the instant case."

We do not decide the merits of this controversy and express no views thereon. We conclude only that the pleadings and the record before the court below, by way of stipulations and testimony, do not disclose a case which requires the extraordinary relief imposed in the preliminary injunction issued. We shall, therefore, vacate the preliminary injunction and remand the matter to the court below so that it may proceed to a full hearing and final adjudication of the suit.

The decree of the Commonwealth Court permitting the intervention of Jane Doe individually and on behalf of all others similarly situated is affirmed.

The decree of the Commonwealth Court granting a preliminary injunction is vacated and the case is re-

manded to the Commonwealth Court for further proceedings consistent herewith. Each party to pay own costs.

Mr. Justice JONES, Mr. Justice ROBERTS, and Mr. Justice BARBIERI concur in the result.

---

CONCURRING AND SUPPLEMENTAL OPINION BY MR. CHIEF JUSTICE BELL:

I concur in the Opinion of the Court. However, because of the importance of the issues, I wish to give in this supplemental Opinion some additional reasons for my concurrence.

This case and the issues involved arose because of a widespread feeling of dissatisfaction and suspicion of fraud in the minds of the general public with the operation of the public welfare system of the Commonwealth. This justifies, requires and demands a thorough investigation by the news media, including the names and addresses of *all* the welfare recipients and the amount each receives, as well as *all* other pertinent data, together with the right of publication. The people of Pennsylvania are entitled to nothing less than this. Free people and a free land cannot exist if governmental affairs are run in camera.