McMullan *v.* Wohlgemuth et al., Appellants.

148

Argued April 28, 1972. Before JONES, C. J., EAGEN, O'BRIEN, ROBERTS, POMEROY, NIX and MANDERINO, JJ.

reargument refused July 30, 1973.

*Marx S. Leopold,* Assistant Attorney General, with him *J. Shane Creamer,* Attorney General, for Commonwealth, appellant.

*Bruce W. Kauffman,* with him *David H. Pittinsky, Carl H. Hanzelik,* and *Dilworth, Paxson, Kalish, Levy and Coleman,* for appellees.

*Jonathan M. Stein* and *Douglas G. Dye,* amicus curiae.

OPINION BY MR. JUSTICE ROBERTS, July 2, 1973:

In early 1971, four reporters of the Philadelphia Inquirer (a metropolitan newspaper owned by the appellee Philadelphia Newspapers, Inc.) requested from Helen Wohlgemuth, the Secretary of the Pennsylvania Department of Public Welfare, and Clarence Jenkins, the Executive Director of the Philadelphia County Board of Public Assistance, permission to examine and inspect departmental lists containing the names and addresses of and amounts received by Philadelphia public assistance recipients. The City Editor of the Inquirer made, at the same time, an identical request, by telegram, to the Governor. Both requests were refused.

Thereafter, on February 14, 1971, appellees filed two actions (one in mandamus, the other in equity) in the Commonwealth Court seeking to gain the requested information. The Commonwealth Court, after conducting a hearing, issued a preliminary injunction enjoining the Department of Public Welfare from withhold-

ing from the appellees a list containing the names and addresses of, and amounts received by, two percent of those people receiving public assistance in the City of Philadelphia. *McMullan v. Wohlgemuth*, 2 Commonwealth Ct. 183 (1971). This Court, after finding no irreparable harm to the Inquirer, reversed that decree. *McMullan v. Wohlgemuth*, 444 Pa. 563, 281 A. 2d 836 (1971). Neither the mandamus action nor the equity suit has advanced since the date of our decision (October 12, 1971), and neither is involved in the instant appeal.

During the pendency of the above two proceedings, the Inquirer, through its Executive Editor, John McMullan, formally requested of Secretary Wohlgemuth that the desired information be made available. Secretary Wohlgemuth, in a letter dated July 7, 1971, formally refused to permit the Inquirer access to the public assistance information it sought. The Inquirer appealed this denial to the Commonwealth Court, which, on December 9, 1971, reversed the decision of the Department of Public Welfare and ordered the Department to grant access, as sought by the Inquirer. *McMullan v. Wohlgemuth*, 3 Commonwealth Ct. 574, 284 A. 2d 334 (1971). This Court granted allocatur and issued a supersedeas to preserve the status quo. We now reverse the order of the Commonwealth Court.

We are here called upon to decide whether appellees, either under our common law or under the "Right-To-Know Act" (Act of June 21, 1957, P. L. 390, §§1 et seq., 65 P.S. §§66.1 et seq.), are entitled to have access to the names and addresses of and amounts received by public assistance eligibles in Philadelphia. Appellees argue in the alternative that even if access is denied under the above theories, the First Amendment to the United States Constitution guarantees them a right to the information they seek. Appellees' contentions, on this record, are without merit.

# I

In 1939, the Pennsylvania Legislature enacted a provision in the Welfare Law which provided for the availability of *names,* addresses and amounts received by recipients of "general assistance." Act of June 26, 1939, P. L. 1091 at 1093.[1]

In 1953, this provision which allowed for the disclosure of "names" was repealed,[2] and in its place the following statute enacted: "Section 7. Powers and Duties of County Boards of Assistance. Each county board of assistance shall have the power, and its duty shall be: [delete old provision] (o) *Upon request by any adult resident of the Commonwealth,* to furnish the *address* and *amount of assistance with respect to persons receiving assistance about whom inquiry is made,*

---

[1] "Section 7. Powers and Duties of County Boards of Assistance. Each county board of assistance shall have the power and its duty shall be: (o) To make available for inspection and examination during office hours, to any taxpayer, in such manner as the county board of assistance may prescribe, the names, addresses, and amount of assistance granted to all persons then receiving general assistance."

[2] This action was apparently taken as a response to the "Jenner Amendment", which made clear the congressional intent that public assistance funds would not be withheld from the States, *solely* because the states choose to make public *certain information regarding welfare disbursements.* Cf. *Indiana v. Ewing,* 99 F. Supp. 734 (D.D.C. 1951). "No state or any agency or political subdivision thereof shall be deprived of any grant-in-aid or other payment to which it otherwise is or has become entitled pursuant to title I, IV, X, or XIV of the Social Security Act, as amended, by reason of the enactment or enforcement by such State of any legislation prescribing any conditions under which public access may be had to records of the disbursement of any such funds or payments within such State, *if such legislation prohibits the use of any list or names obtained through such access to such records for commercial or political purposes.*" Jenner Amendment, Act of October 20, 1951, C.521, Title VI, §618, 65 Stat. 569, 42 U.S.C. §302 (emphasis added).

but such information shall *not be used for commercial or political purposes.*" Act of August 22, 1953, P. L. 1361, at 1364-65 (emphasis added).

A reading of this 1953 provision readily reveals the marked differences between it and its repealed 1939 predecessor, supra. The law as it existed in 1953 was specifically changed in three respects: (1) Disclosure was *not* permitted where the information obtained was to be used for "commercial or political" purposes; (2) the requesting party was now required to be an "adult resident of the Commonwealth", rather than merely a "taxpayer" and; (3) the County Boards of Assistance were no longer permitted to disclose the *names* of those persons receiving public assistance. The prerequisite was legislatively placed upon the "adult resident" to come forward with the name (or names) of a recipient (or recipients) "about whom inquiry is made."

In 1967, the welfare laws were recodified,[3] and the following sections included in the new Public Welfare Code:

"§404. *Regulations for protection of information* (a) The department shall have the power to make and enforce regulations:

(1) *to protect the names of applicants for and recipients of public assistance from improper publication,* and to restrict the use of information furnished to other agencies or persons to purposes connected with the administration of public assistance. Upon request by any *adult resident* of the Commonwealth, the department may furnish the address and amount of assistance with respect to persons about whom inquiry is made; but, *information so obtained shall not be used for commercial or political purposes;* and no information shall

---

[3] Act of June 13, 1967, P. L. 31, art. 4, §§401 et seq., 62 P.S. §§401 et seq.

be furnished regarding any person's application for, or receipt of, medical assistance for the aged."

. . .

"§425. *Furnishing information*

Upon request by any *adult resident* of the Commonwealth, any county board *shall furnish the address and amount of assistance with respect to persons receiving assistance about whom inquiry is made,* but such information shall not be used for commercial or political purposes."

Act of June 13, 1967, P. L. 31, art. 4, §404, §425, 62 P.S. §404, §425 (emphasis added).[4]

In supplementing its statutorily conferred regulatory authority, as set out in §404(a)(1), supra, the Department of Public Welfare adopted Regulation 4143.31 (Department of Public Welfare-Public Assistance Manual):

"4143.31 Request by an *Adult Resident* of Pennsylvania.

(Does Not Apply to Medical Assistance)

Provided that the information is not to be used for political or commercial purposes, *the address and amount of assistance a person is currently receiving are disclosed to any adult resident of Pennsylvania who asks for such information about any person.*

In releasing such information, the County Office must be reasonably assured that *the person is 21 or over*

---

[4] These two sections at first appear to be inconsistent, inasmuch as §404(a)(1) is dicsretionary in phraseology ("may") and §425 mandatory ("shall"). However, applying §§62 and 63 of the Statutory Construction Act, Act of May 28, 1937, P. L. 1019, art. IV, §§62 and 63, 46 P.S. §§562 and 563, which require that statutes in pari materia be construed together as one law, and if possible, that effect be given to both, it is clear that addresses and amounts received by public assistance recipients shall *not be* disclosed by the County Boards of Assistance *unless* and until the Department of Public Welfare permits it.

and a resident of Pennsylvania; the County Office also takes the following steps:

a. If the inquirer appears in person, the information in the 'Request' section of the PA. 163, REQUEST FOR ADDRESS AND/OR AMOUNT OF ASSIST-ANCE, is filled in, and *the person* making the request signs the form, before the information is disclosed. The 'Reply' section of the form is then filled in.

b. If the request is made by telephone and the inquirer is known to the person receiving the request and the inquirer knows about the *restrictions on the use* of information, the information is given over the telephone; otherwise the inquirer is advised to either come to the office or to make his request in writing. When information is given over the telephone, the person giving the information prepares a PA. 163 for file, showing the name of *the person* making the request.

c. If the information is requested by correspondence, the County Office prepares a reply in duplicate, always including in any reply that gives information the following excerpts from the Public Welfare Code: . . ."

. . .

"Section 483 Penalties.—'Any person knowingly violating any of the rules and regulations of the department made in accordance with the Article shall be guilty of a misdemeanor, and, upon conviction thereof, shall be sentenced to pay a fine, not exceeding one hundred dollars ($100), or to undergo imprisonment, not exceeding six months, or both.' " (emphasis added.)

In addition to Regulation 4143.31, the Department has also adopted Regulation 4142, which, in full conformity with the 1967 statute it implements (§404 (a) (1), supra), forbids disclosure of the "[n]*ames of applicants and recipients*" of public assistance. See also Regulations 4143 et seq. Department of Public Welfare-Public Assistance Manual.

Interpreting §404(a)(1), §425, and the regulations which implement §404(a), we must conclude that: (1) the requesting "adult resident" *must* supply the *name*(s) of a recipient(s) *before* the Department of Public Welfare or the County Boards of Assistance are authorized to disclose the recipient's address and the amount of public assistance received; (2) all requests for information *must* be made by an "adult resident of the Commonwealth" and; (3) information so obtained may not be used for a "commercial or political" purpose.

The corporate appellee (newspaper) must be denied access to the information it requests since it fails to meet all three of the above statutory requirements. Clearly, no one would seriously suggest that the Philadelphia Newspapers, Inc. is an "adult resident" of Pennsylvania. In the 1953 and 1967 revisions of the Public Welfare Law, the Legislature clearly narrowed the class of those entitled to request information (the addresses and amounts received by public assistance recipients) from "taxpayers" to "adult residents of the Commonwealth." This classification obviously does not include corporations, such as the appellee here. If the Legislature had intended to include "corporations" in the class eligible to request information, it explicitly could have done so. Despite this plain language, the court below directed that the corporate appellee be furnished information forbidden to it by statute. That court apparently failed to realistically discern that the individual appellees are one and the same as their corporate counterpart.

Although the important informational role of the press cannot be over-emphasized, and although the Inquirer's goal here may be laudable, appellees have not asserted any non-commercial or non-political use for the public assistance information requested. Thus, we

cannot indulge in conjecture to conclude that once obtained, the information would be used solely by the newspaper, its individual appellee-editor, or reporter for non-commercial and non-political purposes. Sections 404(a)(1) and 425, supra, explicitly forbid disclosure under these circumstances.

Finally, and most importantly, the appellee-newspaper, as well as the individual appellees, are foreclosed under §§404(a)(1) and 425, supra, since they have failed to produce the *names* of recipients "about whom inquiry is made." A common sense reading of the statutes, and a review of the legislative reforms of the last thirty years, makes it abundantly clear that the Legislature in the 1953 and 1967 public welfare enactments, supra, placed the responsibility on the "adult citizen" to produce the *names* of those recipients "about whom inquiry is made."[5]

---

[5] Here, the appellees argue that this requirement was met when the Department of Public Welfare was given a Philadelphia telephone directory by the appellees, and requested to furnish the appellees with the *names*, addresses and amounts received by all those listed in the directory who were receiving public assistance funds. (See appellees' brief at pp. 23-24, n.12.) By submitting a telephone directory, the appellees have attempted to do indirectly that which is explicitly prohibited from being done directly—they have demanded the *names* of all public assistance recipients (who have a listed telephone) within the City of Philadelphia. Such an all inclusive and unreasonable act, encompassing more than 500,000 Philadelphia telephone subscribers, can hardly be conceived of as being in compliance with the statutes.

If it were concluded otherwise, all who are in possession of a telephone directory or other similar compilation, including voter lists, could compel the Department of Public Welfare and the County Boards of Assistance to research the directory's listings, and dissect from them those people who receive public assistance. (There are more than 4,500,000 telephone subscribers in the Commonwealth, and more than 5,000,000 registered voters.) This task, beyond question, would be enormous, and in fact, could well transform public welfare services into informational disbursement offices, with the attending huge expenditures of time and money.

Appellees, in their initial administrative requests submitted to appellants, in their pleadings and briefs to the court below, and in their briefs on this appeal, have consistently insisted that they be furnished not only the addresses of all recipients in Philadelphia and the amounts received, but also the *names* of all Philadelphia citizens on public assistance. At no point in the entire proceedings have the appellees, in compliance with §§404(a)(1) and 425, supra, provided appellants with the names of those people they seek to investigate.[6] Instead, they have merely furnished a Philadelphia telephone directory, containing more than 500,000 listings. See footnote 5, supra.

Accordingly, since the appellees have failed to comply with the mandatory and unambiguous statutory requirements, the information they seek must be denied. The statutory requirements (§§404(a)(1) and 425, supra) mean exactly what they say—"any adult resident of the Commonwealth" can request that the County Boards of Assistance or the Department of Public Welfare furnish ". . . the address and amount of assistance with respect to persons about whom inquiry is made." These provisions *only* allow for the disclosure of *addresses and amounts received* with respect to those

---

Were appellees' view to prevail, these listings could encompass the entire Commonwealth. Surely, the funds and time required to comply with such potentially unlimited and extensive requests would affect adversely the quality and costs of public assistance programs in Pennsylvania.

[6] See, e.g., the statement of facts and the issues presented, as framed by the Commonwealth Court, in this case below, 3 Pa. Commonwealth Ct. 574, 575, 284 A. 2d 334 (1971), and in *McMullan, et al v. Wohlgemuth, et al.*, 2 Pa. Commonwealth Ct. 183 (1971). In its brief submitted here, the appellees urge this Court to affirm the order of the Commonwealth Court allowing appellees the right ". . . to *inspect Welfare Department lists* containing the *names* and addresses of recipients of public assistance and the amount of assistance each receives." (emphasis added.)

"about whom inquiry is made." This does not mean, as the appellees contend, a list of the *names* of all people receiving public assistance.

## II

Despite the clear mandate of §§404(a)(1) and 425, supra, appellees nonetheless contend that the "Right To Know Act"[7] entitles them to the information they seek. Appellees have misinterpreted the clear language of the "Right To Know Act", and particularly the exceptions contained therein, as well as §§404(a)(1) and 425, supra, and the attendant Department of Public Welfare regulations.

The "Right-To-Know Act" gives "any member of the Commonwealth" a statutory right of access to every "public record" of a state agency. A "public record" is defined by the Act as: "Any account, voucher or contract dealing with the receipt or disbursement of funds by an agency or its acquisition, use or disposal of services or of supplies, materials, equipment or other property and any minute, order or decision by an agency fixing the personal or property rights, privileges, immunities, duties or obligations of any person or group of persons . . . ." 65 P.S. §66.1(2) That definition, although appearing to be broad enough to encompass the records sought here, *McMullan v. Wohlgemuth,* supra, 444 Pa. at 567, 281 A. 2d at 838, is much narrower when read in conjunction with the Act's four clear exceptions to the "public record" disclosure definition:

"[T]he term 'Public Records'—

"1   shall not mean any report, communication or other paper, the publication of which would disclose the institution, progress or result of an investigation un-

---

[7] Act of June 21, 1957, P. L. 390, §§1 et seq., 65 P.S. §§66.1 et seq.

dertaken by an agency in the performance of its official duties, except those reports filed by agencies pertaining to safety and health in industrial plants;

"2 *shall not include any record, document, material, exhibit, pleading, report, memorandum, or other paper, access to or the publication of which is prohibited, restricted or forbidden by statute law* or order or decree of court,

"3 [shall not include any record, document, material, exhibit, pleading, report, memorandum or other paper, access to or the publication of which] would operate to the prejudice or impairment of a person's reputation or personal security,

"4 [shall not include any record, document, material, exhibit, pleading, report, memorandum or other paper, access to or the publication of which] would result in the loss by the Commonwealth or any of its political subdivisions or commissions or State or municipal authorities of Federal funds, excepting therefrom however the record of any conviction for any criminal act. 65 P.S. §66.1(2)." (emphasis added.)

Sections 404(a)(1) and 425 of the Public Welfare Code prohibit the disclosure of *names* of public assistance recipients. And the sections *clearly do not* permit the disclosure of addresses or amounts received by recipients where the information obtained is to be used for a "commercial purpose." Therefore, how can it be said that exception (2) of the "Right to Know Act" (noted above) does not exempt from public disclosure the information sought by appellees. The simple answer to this rhetorical question is that it cannot be. Sections 404(a)(1) and 425, supra, are "statute law[s]" which prohibit, restrict and forbid "access to" the names of public assistance recipients, and where to be used for a "commercial" purpose, the addresses and amounts received by those receiving public assistance.

Accordingly, the applicability of exception (2) of the "Right to Know Act" to the instant situation is manifestly clear and adversely disposes of appellees' claim.[8]

Appellees also contend they are entitled to the information they seek under the common law of this Commonwealth. Such an assertion must be dismissed. As this Court said in *Mooney v. Temple University Board of Trustees,* 448 Pa. 424, 429-30, n.10, 292 A. 2d 395, 398, n.10 (1972) : "It is unquestioned that the right to inspect public documents was no broader at common law than it is presently under the statute ["Right to Know Act", supra]; it may have been more restricted by being limited only to persons with a 'personal or property interest' in the matter sought to be disclosed. *Wiley v. Woods,* 393 Pa. 341, 347-50, 141 A. 2d 844, 848-49 (1958). *Therefore, disposition of appellant's claim under the Inspection and Copying Records Act ["Right to Know Act," supra] a fortiorari resolves appellants' claims at common law."* (emphasis added.)

### III

In view of the foregoing statutory analysis and the conclusion that the statutory provisions preclude appellees from obtaining the information they seek, we must now consider whether the "Right to Know Act", supra, and §§404(a)(1) and 425 of the Public Welfare Code, supra, as applied, are unconstitutional, as being violative of appellees' rights under either the Unit-

---

[8] Although exception (2) of the "Right to Know Act" clearly exempts the information sought by appellees, exceptions (1) (investigative exception) and (3) (reputation and personal security exception) are equally persuasive in foreclosing appellees' contentions. However, since the language of exception (2) so clearly controls here, further discussion of exceptions (1) and (3) is unnecessary.

ed States Constitution[9] or that of the Commonwealth of Pennsylvania.[10] In essence, appellees argue that to deny them the names of Philadelphia residents receiving public assistance, is tantamount to an abridgement of the press' right to obtain "access" to sources of information, a right purportedly guaranteed the press under both federal and state constitutional provisions. That contention, on these facts, must be expressly rejected.

Appellees suggest, and we agree, that this is *not* a case involving the right of the press to print, publish and distribute information. If it were, the result we reach would be quite different. Cf. *New York Times Co. v. United States*, 403 U.S. 713, 91A S. Ct. 2140 (1971), and the cases cited therein. Here, no impermissible prior restraint is involved. The sole question presented is whether the First Amendment, made applicable to the states through the Fourteenth Amendment, of the United States Constitution, and art. I, §7 of the Pennsylvania Constitution, guarantee the press the unrestricted right to "gather" news by compelling County Boards and the Department of Public Welfare to furnish appellees with a list of the names of all Philadelphians receiving public assistance. In our view, neither constitutional provision so provides.

---

[9] U.S. Const., Amend. 1

"Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press. . . ."

[10] Pennsylvania Const., Art. 1, sec. 7.

"The printing press shall be free to every person who may undertake to examine the proceedings of the Legislature or any branch of government, and no law shall ever be made to restrain the right thereof. The free communication of thoughts and opinions is one of the invaluable rights of man, and every citizen may freely speak, write and print on any subject, being responsible for the abuse of that liberty. . . ."

It appears clear that this Court has decided that no such absolute right to gather news (i.e., compel the furnishing of information), statutorily protected from disclosure, exists under Art. I, §7 of the Pennsylvania Constitution. *Taylor and Selby Appeals,* 412 Pa. 32, 193 A. 2d 181 (1963). Although the Pennsylvania Legislature has wisely created an absolute statutory right of a newsman to preserve the confidentiality of his sources of information, Act of June 25, 1937, P. L. 2123, §1, 28 P.S. §330, *Selby,* supra, explicitly stated that but for the statutory provision, the Commonwealth could constitutionally compel a newsman to divulge his sources. See also *Branzburg v. Hayes,* 408 U.S. 665, 92 S. Ct. 2646 (1972). Implicitly, this Court in *Selby,* expressed its view that art. I, §7, of the Pennsylvania Constitution goes no further than its federal counterpart in guaranteeing that the press be free to print, publish and distribute.

No United States Supreme Court decisions have been found which directly hold that the First Amendment embodies the right of the press to "gather" news. So, too, there is no authority whatever for judicially compelling the disclosure to the press of material, statutorily restricted.

Nevertheless, it is perhaps logical to assume that such a right to gather news "of some dimensions must exist" if the First Amendment is to have realistic vitality. As Mr. Justice STEWART recently stated in his dissenting opinion in *Branzburg,* supra: "A corollary of the right to publish must be the right to gather news. . . . News must not *unnecessarily* be cut off at its source, for without freedom to acquire information the right to publish would be impermissibly compromised. Accordingly, a right to gather news, of *some dimensions,* must exist." 408 U.S. at 727, 728, 92 S. Ct. at 2672-73 (emphasis added) (citation omitted). Although

we agree that such a right, emanating from the First Amendment, does exist, this right, as all other First Amendment rights, is not absolute. See, e.g., *Selby*, supra at 39, 193 A. 2d at 184, and the cases cited therein. Here, appellees have no right to compel the disclosure of names explicitly restricted by statute.

In this instance, appellees have advanced no persuasive reasons why the right of the press should be given wider boundaries than that of the public it seeks to inform. As the Court noted in *Branzburg*, supra: ". . . [T]he First Amendment does not guarantee the press a constitutional right of *special access* to information not available to the public generally. Zemel v. Rusk, 381 U.S. 1, 16-17 (1965); New York Times v. United States, 403 U.S. 713, 728-30 (1971) (STEWART, J., concurring); Tribune Review Publishing Co. v. Thomas, 254 F. 2d 883, 885 (CA3 1958); In the Matter of United Press Assns. v. Valente, 308 N.Y. 71, 77, 123 N.E 2d 777, 778 (1954)." 408 U.S. at 684, 92 S. Ct. at 2657. *"The right to speak and publish does not carry with it the unrestrained right to gather information." Zemel*, supra at 17, 85 S. Ct. at 1281 (emphasis added).[11] See

---

[11] "Despite the fact that news gathering may be hampered, the press is regularly excluded from grand jury proceedings, our own conferences, the meetings of other official bodies gathered in executive sessions, and the meetings of private organizations. Newsmen have no constitutional right of access to the scenes of crime or disaster when the general public is excluded, and they may be prohibited from attending or publishing information about trials if such restrictions are necessary to assure a defendant a fair trial before an impartial tribunal. In Sheppard v. Maxwell, 384 U.S. 333 (1966), for example, the Court reversed a state court conviction where the trial court failed to adopt 'stricter rules governing the use of the courtroom by newsmen as Sheppard's counsel requested,' neglected to insulate witnesses from the press, and made no 'effort to control the release of leads, information, and gossip to the press by police officers, witnesses, and the counsel for both sides.' *Id.*, at 358, 359. '[T]he trial court might well have proscribed extra-

164

also *Quad-City Community News Service, Inc. v. Jebens,* 334 F. Supp. 8 (S.D. Iowa 1971).

The holding of the Third Circuit in *Tribune Review Publishing Co. v. Thomas,* supra, is especially relevant here: "Realizing that we are not dealing with freedom of expression at all but with rules having to do with gaining access to information on matters of public interest, can it be argued that here there is some constitutional right for everybody not to be interfered with in finding out things about everybody else? We suppose it would not be contended that a newspaper reporter or any other citizen could insist upon entering another's land without permission to find out something he wanted to know. In the same way merely because someone's private letters might be interesting as gossip or as models of English composition it would hardly be argued that one could open another's desk and read through what he finds there. Could an interested observer insist on the constitutional right to take motion pictures of a private family in and about its household contrary to that family's wishes? *We think that this question of getting at what one wants to know, either to inform the public or to satisfy one's individual curiosity is a far cry from the type of freedom of expression, comment, criticism so fully protected by the first and fourteenth amendments of the Constitution.*" 254 F. 2d at 885 (emphasis added).

Here, the Commonwealth's interest in protecting the privacy of those it aids through public assistance is paramount and compelling. The Legislature, by enacting §§404(a)(1) and 425 of the Public Welfare Code,

---

judicial statements by any lawyer, party, witness, or court official which divulged prejudicial matters.' *Id.,* at 361. See also Estes v. Texas, 381 U.S. 532, 539-540 (1965) ; Rideau v. Louisiana, 373 U.S. 723, 726 (1963)." *Branzburg v. Hayes,* 408 U.S. at 684, 685, 92 S. Ct. at 2658 (1972).

supra, has clearly set forth its intent that maintaining the privacy of the recipient is a crucial element in its quest to preserve "family life" and "encourage self-respect, self-dependency and the desire to be a good citizen and useful to society." Act of June 13, 1967, P. L. 31, art. 4, §401, 62 P.S. §401. Such a preponderant interest unquestionably outweighs any non-absolute right of the press to "gather news," by compelling the material it seeks. Here, as in *Tribune Review Publishing Co. v. Thomas,* supra, "we are not dealing with freedom of expression at all" but with appellees' request to have furnished to them a list of all Philadelphia public assistance eligibles.

The statutory ban against disclosing the names of public assistance recipients is a clear recognition and directive by the Legislature that the privacy of the recipient is a fundamental need worthy of protection. This Court is bound to give great deference to this sound legislative judgment. The statutory limitation imposed on appellees' asserted First Amendment right to compel the disclosure of those receiving assistance is no greater than necessary to protect the substantial governmental and individual interests involved. *Sherbert v. Verner,* 374 U.S. 398, 83 S. Ct. 1790 (1963); *NAACP v. Button,* 371 U.S. 415, 83 S. Ct. 328 (1963); *Shelton v. Tucker,* 364 U.S. 479, 81 S. Ct. 247 (1960). Accordingly, in the face of this legislative directive, appellees cannot prevail.[12] Again, we emphasize that this

---

[12] Appellees cite, in their brief, *The Washington Post Co. v. Kleindienst,* C.A. No. 467-72 (April 5, 1972), an unpublished opinion by the United States District Court for the District of Columbia, for the proposition that the press does have a qualified constitutional right to gather news. Although we agree with that assertion, a careful reading of the district court's opinion does not support appellees' argument here. In *Kleindienst,* the court was dealing with a situation where both the press *and the individual to be interviewed* desired disclosure. Such are not the facts of the

Court is not here concerned with the right of a newspaper to publish information *which it has already acquired. Cf. New York Times Co. v. United States,* supra. What appellees here seek is the compelled disclosure of names of public assistance recipients, statutorily made non-available.

Having determined appellees' arguments adversely to them, we need not consider appellants' contention that the disclosure of the names and addresses of and amounts received by public assistance recipients would violate the constitutional right of privacy guaranteed these needy citizens. The Legislature in excluding the names of public assistance recipients from public disclosure wisely avoided this constitutional challenge. See §§404(a)(1) and 425 of the Public Welfare Code, supra.

The order of the Commonwealth Court is reversed.

Mr. Justice EAGEN concurs in the result.

---

DISSENTING OPINION BY MR. JUSTICE POMEROY:

I find it ironical that the Court, especially at this particular time in our national experience, through a restrictive and erroneous reading of legislative acts, should bar a large metropolitan newspaper from govern-

present controversy. As the court in *Kleindienst* succinctly stated: *"There is, of course, an absolute right of privacy which the press cannot invade.* An individual may refuse to be interviewd. Those who wish to consult or meet in private for the day-to-day conduct of public or business affairs may, in furtherance of their own common right to privacy, exclude the media. These commonly accepted situations are, however, obviously quite distinct from the special circumstances presented by this particular controversy. Here the Bureau has not denied the press access to its own personnel. Rather, it has imposed a bar on persons placed in its care by the courts *who may wish to talk with the press and are willing to be interviewed."* (emphasis added.)

ment records of disbursement of public monies to private individuals. Since my reading of these same statutes cannot be reconciled with that of the majority, I must respectfully dissent.

The starting point in answering a question involving access to government-controlled information in Pennsylvania is the Act of June 21, 1957, P. L. 390, 65 P.S. §66.1 et seq., popularly called the "Right-To-Know Act," which provides broadly that "[e]very public record of an agency shall at reasonable times be open for examination and inspection by any citizen of the Commonwealth of Pennsylvania." 65 P.S. §66.2. That statute defines the term "public record" in terms clearly broad enough to encompass the information sought here by *The Inquirer*.[1] Within that provision, however, there are stated four exceptions:

"[T]he term 'public records'—

"1* shall not mean any report, communication or other paper, the publication of which would disclose the institution, progress or result of an investigation undertaken by an agency in the performance of its official duties, except those reports filed by agencies pertaining to safety and health in industrial plants;

"2* shall not include any record, document, material, exhibit, pleading, report, memorandum, or other

---

[1] "(2) 'Public Record'. Any account, voucher or contract dealing with the receipt or disbursement of funds by an agency or its acquisition, use or disposal of services or of supplies, materials, equipment or other property and any minute, order or decision by an agency fixing the personal or property rights, privileges, immunities, duties or obligations of any person or group of persons. . . ." See *McMullan v. Wohlgemuth*, 444 Pa. 563, 567, 281 A. 2d 836 (1971) ("[T]hat definition is clearly broad enough to encompass the records sought here").

* The numbers placed opposite each exception and the bracketed repetition of the phrase [shall not include . . . .] do not appear in the statute; I have added them to facilitate later discussion.

paper, access to or the publication of which is prohibited, restricted or forbidden by statute law or order or decree of court,

"3* [shall not include any record, document material, exhibit, pleading, report, memorandum or other paper, access to or the publication of which] would operate to the prejudice or impairment of a person's reputation or personal security.

"4* [shall not include any record, document, material, exhibit, pleading, report, memorandum or other paper, access to or the publication of which] would result in the loss by the Commonwealth or any of its political subdivisions or commissions or State or municipal authorities of Federal funds, excepting therefrom however the record of any conviction for any criminal act. 65 P.S. §66.1(2)."

The Commonwealth argued in this Court that exemptions (1) through (4) inclusive apply to bar *The Inquirer* from access. I note, however, that no argument was presented with respect to exception (1) in the Commonwealth Court; under settled principles this Court should not decide it on this appeal. Although the majority states that exceptions (1) and (3) "are equally persuasive in foreclosing the appellees' contentions," Opinion of the Court, ante at 160 n.8, it does not decide the applicability of either exception. I will follow suit and not discuss (1), (3) or (4); suffice it to say that I do not find them either persuasive or applicable.

The crux of the matter then is the applicability of exception (2): Is there a statute which *prohibits* access to or publication of the information sought by *The Inquirer*? As the majority correctly determines, there are two sections of the Public Welfare Code of 1967 which are relevant:

"§404.   Regulations for protection of information

"(a)    The Department shall have the power to make and enforce regulations:

"(1)    to protect the names of applicants for and recipients of public assistance from improper publication, and to restrict the use of information furnished to other agencies or persons to purposes connected with the administration of public assistance. *Upon request by any adult resident of the Commonwealth, the department may furnish the address and amount of assistance with respect to persons about whom inquiry is made; but, information so obtained shall not be used for commercial or political purposes*; and, no information shall be furnished regarding any person's application for, or receipt of, medical assistance for the aged.

"§425.   Furnishing information

*Upon request by any adult resident of the Commonwealth, any county board shall furnish the address and amount of assistance with respect to persons receiving assistance about whom inquiry is made, but such information shall not be used for commercial or political purposes.*" Act of June 13, 1967, P. L. 31, art. IV, §§404, 425, 62 P.S. §§404, 425 (emphasis added).   The Commonwealth argues that these sections only provide for disclosure of *addresses* and *amounts* of assistance received by the public welfare recipient, and do not permit the disclosure of *names*.   In addition the Commonwealth argues that the attempt by the appellees to comply with the apparent statutory requirement that they furnish names—appellees presented a Philadelphia telephone directory—cannot be regarded as sufficient.[2]   As

---

[2] Additionally, the Department of Public Assistance stipulated in the Commonwealth Court that "were the plaintiffs to submit to the [Department] voter registration lists or telephone directories of names, the Department would refuse to tell . . . which of those are on public assistance and how much they receive." Appellees' Supplemental Record at 3b.

background for considering these arguments, it is necessary to develop the history of sections 404 and 425 of the Public Welfare Code, significant parts of which the Court's opinion disregards.

In 1939 our Legislature enacted the following provision in the then Welfare Code:

"Section 7. Powers and Duties of County Boards of Assistance.

"Each county board of assistance shall have the power and its duty shall be:

"(o) To make available for inspection and examination during office hours, to any taxpayer, in such manner as the county board of assistance may prescribe, *the names, addresses, and amounts of assistance* granted to all persons then receiving general assistance." Act of June 26, 1939, P. L. 1091 (emphasis added). This provision remained the statutory law of the Commonwealth for a period of fourteen years. Were the statute still framed in these terms it could not be argued that the information sought here would not be available.

In 1951 the federal Social Security Administration (precursor of the Department of Health, Education and Welfare) ruled that a similar provision in the Indiana Welfare Act did not conform to federal requirements in that it made available to the general public the *names, addresses* and *amounts* received by welfare recipients, and therefore the federal Administrator withheld federal funding of Indiana's assistance programs. That ruling was upheld in *Indiana v. Ewing,* 99 F. Supp. 734 (D.D.C. 1951). Congress, however, almost immediately reacted to overrule the federal court decision by attaching to the Revenue Bill of 1951 what came to be known as the "Jenner Amendment", and enacting it into law. It provided: "No state or any agency or political subdivision thereof shall be de-

prived of any grant-in aid or other payment to which it otherwise is or has become entitled pursuant to [various sections of the federal code] by reason of the enactment or enforcement by such State of any legislation prescribing any conditions under which public *access may be had* to records of the disbursement of any such funds or payments within such State, if such legislation prohibits the use of any list or names obtained through such access to such records for commercial or political purposes." Act of October 20, 1951, c.521, tit. VI, §618, 65 Stat. 569, now codified at 42 U.S.C. §302 (historical note) (emphasis added). That legislation, having been prompted by a court decision invalidating the Indiana disclosure provisions, in effect gave Congressional sanction to a state statute which not only made such information available to public inspection, but which required the welfare officials to make lists and post them in the office of the county auditor.[3]

On November 8, 1951 the Administrator of the Social Security Administration circulated to each state office of welfare administration his State Letter No. 166[4] containing the following interpretation of §618 of

---

[3] The House Conference Report on the Revenue Act of 1951, 2 U.S. Code Cong. and Admin. News, 82d Cong., 1st Sess. 2121, 2169, reads as follows: "Under this amendment [The Jenner Amendment], as agreed to by the conferees, the State of Indiana . . . will be entitled to receive its payment under the Social Security Act in the future and will also be entitled to receive any such payments which have been withheld because of the enactment and enforcement of the Indiana law."

The Indiana statute in question in *Indiana v. Ewing*, supra, was never subsequently amended and remains in its 1951 form today. 10 Burns' Indiana Stat. Ann. §52-1260. The restriction on "commercial or political use" which appeared in the Jenner Amendment was copied verbatim from the Indiana statute.

[4] The interpretation of the Jenner Amendment contained in State Letter No. 166 of November 8, 1951 remains the stated interpretation today. See 45 C.F.R. §205.50 (1972) ; HEW Handbook of Public Assistance Administration, Part IV, §7110.

the Revenue Act of 1951 (Jenner Amendment) : "However, it must be noted that the congressional language was phrased so as not to go beyond permitting public access to such records. That is to say, the use in section 618 of the phrase *'access may be had'* would seem to *require that the public take the initiative* in seeking access to and examining the records of disbursement and payment and that *the State itself refrain from taking the initiative* in general distribution to the public of such information by means of publication or otherwise."

The Pennsylvania General Assembly in 1953 amended the 1939 provision on access to names, addresses and amounts (set out supra) so as to read as follows:

"Section 7. Powers and duties of County Boards of Assistance.

"Each county board of assistance shall have the power, and its duty shall be:

\* \* \*

"(o) Upon request by any adult resident of the Commonwealth, to furnish the address and amount of assistance with respect to *persons* receiving assistance about whom inquiry is made, but such information shall not be used for commercial or political purposes." Act of August 22, 1953, P. L. 1361 (emphasis added).[5]

---

It would appear that this interpretation was unnecessarily restrictive, turning as it did on the use by Congress of the passive voice ("access may be had") and ignoring as it did the fact that Congress had by the Jenner Amendment sanctioned state legislation which not only did not have the state "refrain from taking the initiative", but affirmatively required the state officials to prepare and post a list for public inspection.

[5] The title of this 1953 amendment to the Public Welfare Code recited as its purpose that of "authorizing the Department [of Public Assistance] and local boards to *disclose the identity* of recipients of assistance and amounts received." I fail to understand how the Court can find in this 1953 amendment, with this recited purpose of disclosing the identity of recipients, the expression of a legisla-

It is apparent that this amendment of 1953 was enacted in direct response to the Jenner Amendment, as interpreted by the Social Security Administration. It (1) directly tracked the Jenner Amendment's language as to the "commercial or political" purpose restriction; and (2) it clearly placed upon the person making inquiry the obligation to suggest names to the county board of assistance, in response to which the board would inform the inquiring person whether or not the persons named were welfare recipients and, if so, where they lived and how much they received. In other words, the disclosure was now to be initiated by the person making the inquiry, and not by the Board.

In 1967 the Pennsylvania legislature enacted a consolidation and codification of the existing laws, Act of June 13, 1967, P. L. 31. The 1953 amendment, as set forth above, was the direct ancestor of sections 404 and 425 of the 1967 enactment, the first of which provides that the Department "may" provide the addresses of and amounts of assistance received by "persons about whom inquiry is made", and the second of which provides that the county board "shall" do so.

(a) *"Persons About Whom Inquiry Is Made"*

The root question, of course, is whether the second exception to the definition of public record contained in the Right-To-Know Act (i.e., those records "access to or the publication of which is prohibited, restricted or forbidden by statute law. . . .") serves to bar *The Inquirer* (or any citizen of the Commonwealth, for that matter) from obtaining the information it here seeks. Having in mind the historical background detailed above concerning the disclosure of public assistance in-

---

tive intention to protect the names of welfare recipients. It is obvious that if the inquiring party suggests a name, and receives an affirmative response, he has ascertained the *identity* of a recipient.

formation under the Public Welfare Code of 1967, the inescapable conclusion is that there is no bar. It is clearly permissible under section 425 of that Code, for example, to discover the *identity* of a recipient of public assistance (by offering a name and receiving an affirmative response from the county board). The question becomes, then, what *procedure* must be followed to obtain the information?

I think it beyond dispute that the only policy change reflected in the 1953 amendment to the Public Welfare Code was a legislative desire to comply with the drafting suggestions of the Administrator of the Social Security Administration, viz., that the initiative, the burden of inquiry as it were, be placed upon the interested citizen, and that the State itself refrain from taking the initiative of disclosure. If compliance with legislative *policy* were all that were required, appellees' efforts to carry the burden of making inquiry should clearly suffice. A court, however, is not permitted to disregard statutory language which is "clear and free from all ambiguity" under the guise of pursuing the "spirit" of the statute. Statutory Construction Act of 1970, added by Act of December 6, 1972, P. L. 1482, §1921(b). Here the statute (section 425) requires in clear language that the county board furnish the address and amount of assistance received by "persons about whom inquiry is made." To take advantage of this provision, then, one must make inquiry about persons, that is to say, must furnish the board with names of people.

The statute makes no distinction whatever between, say, inquiry about ten persons and inquiry about a thousand or ten thousand. Nor does the history of the provision support such a limitation. *The Inquirer* in fact presented the county board with a Philadelphia telephone directory and demanded that the board indicate which persons listed therein were recipients of public

assistance. It may well be that it would prove burdensome for the employees of the county board to search such a listing for the names of welfare recipients. The burden, however, was created by the Legislature when it empowered interested citizens to offer the board names of "persons about whom inquiry is made." Obviously the statute requires the board's employee to take the submitted name or names and search the county's records.[6]

Seeing nothing in either the language or the policy of the statute which would in any way limit the number of persons about whom inquiry may be made at one time, I would hold that *The Inquirer* met the precondition of section 425 of the Public Welfare Code and is entitled to a response from the Philadelphia County Board of Public Assistance.

---

[6] To lighten this chore when, as here, an inquiry is directed towards all persons within a large geographic area, the board might well permit the inquiring party to inspect lists of names, addresses and amounts of assistance received by persons in that area; such, indeed, is the normal procedure under the Right-To-Know Act, 65 P.S. §66.2.

As explained in the text, ante, the present versions of sections 404 and 425 of the Public Welfare Code of 1967 stem directly from the unsound attempt of the Social Security Administration, following enactment of the Jenner Amendment, to make an interpretation of that statute turn on Congressional use of the passive voice, "access may be had." The amendment in 1953 to the Pennsylvania Welfare Code reflected nothing more than an attempt to gear the statutory provision permitting access to welfare records from the active voice (the Board of Assistance "shall . . . make available for inspection and examination . . . .") into the passive voice ("upon request of any adult resident . . . ."). The difference between the active and passive voices is stylistic only, and it is not such as to change the result. There is thus nothing startling in the conclusion that the changed mode of procedure, while it places the initiative upon the person who inquires, does not in fact change the net product of ascertainable information.

(b) *"Not Be Used for Commercial or Political Purposes"*

In a single paragraph and without citation to any authority, the Court holds, although the issue is nowhere raised, that until *The Inquirer* shows to the contrary it must be taken that its purpose is commercial or political, and that it is thus not entitled to the information. We have not heretofore had occasion to interpret the word "commercial" in the context of this section of the Public Welfare Code. Guidance may be had, however, from the analogous situation presented by a newspaper's claim to privilege under the libel laws. In *New York Times Co. v. Sullivan*, 376 U.S. 254, 266, 11 L. Ed. 2d 686 (1964), the United States Supreme Court, in recognizing a conditional privilege arising under the First Amendment to publish defamatory material, was unimpressed by the argument that the newspaper-petitioner's claim to protection was forfeited by the commercial nature of its activities: "That the Times was paid for publishing the advertisement is as immaterial in this connection as is the fact that newspapers and books are sold . . . [W]e hold that if the allegedly libelous statements would otherwise be constitutionally protected from the present judgment, they do not forfeit that protection because they were published in the form of a paid advertisement." See also *Rosenbloom v. Metromedia, Inc.*, 403 U.S. 29, 44 n.12, 29 L. Ed. 2d 296 (1971) ;[7] *Grove v. Dun & Bradstreet, Inc.*, 438 F. 2d 433 (3d Cir. 1971) (private subscription credit report of restricted distribution held not protected by *New York Times Co. v. Sullivan*) ; *Baird v.*

---

[7] "We also intimate no view on the extent of constitutional protection, if any, for *purely* commercial communications made in the course of business. . . ." *Rosenbloom*, supra, 403 U.S. at 44 n.12 (emphasis added).

*Dun & Bradstreet, Inc.*, 446 Pa. 266, 285 A. 2d 166 (1971) (same).

While admittedly the content of the word "commercial" in the Welfare Code is not necessarily the same as when considered in the above First Amendment context, no policy appears which would cause us to hold that the "fact that newspapers . . . are sold" is critical to the problem before us and yet "immaterial" in the context of *Times v. Sullivan.* Undoubtedly the Legislature had in mind the obtaining and resale of such information to persons who would, for example, make the recipients of public assistance the focus of some sort of selling activity or some sort of political pressure.

There is thus no basis whatever on this record for us to hold that *The Inquirer's* purpose is of such a crass pecuniary nature and is not a purpose normally associated with the operation of a newspaper. As the majority notes, there is a statutory penalty (six months' imprisonment and/or $100 fine) for violation of the Department of Public Assistance's regulation prohibiting commercial or political use of such information. See Department of Public Welfare Regulation 4143.43, 62 P.S. §483. Other sanctions may also be available. I should think that the Court's hesitancy in permitting prior restraints would indicate that the proper approach to the question of purpose would be to permit *The Inquirer* access and punish it subsequently for misuse. That is, of course, the normal mode of enforcing statutorily proscribed modes of conduct under our system of law. That approach is, moreover, what the statute clearly contemplates. Its interdiction is not to the obtaining of the information with proscribed intent, but to the use of the information after obtaining it: "information *so obtained* shall not be used for commercial or political purposes. " 62 P.S. §425. Clearly the stage of prevention of or punishment for misuse of

information has not yet been reached, and indeed may never be.

### (c) *"Shall" or "May"*

Section 404 of the Public Welfare Code provides that the Department of Public Assistance "may" disclose the addresses of and amounts of assistance received by persons about whom inquiry is made. Section 425 of the Code, on the other hand, provides that the county board "shall" make that same disclosure. The majority concludes in a footnote (Opinion of the Court at 153 n.4), again without the issue having been raised by any party, that the word "may" in section 404 should be read as empowering the Department to publish a regulation that the county board "shall not" make such disclosure, the mandate of section 425 to the contrary notwithstanding. This is said to be an *in pari materia* construction which gives effect to both provisions. Act of December 6, 1972, P. L. 1482, §1932. In my view, it is a wrenching of words to force a result directly contrary to the express provisions of the Code.

There is no major problem of construction presented by the permissive provision of one paragraph and the mandatory language of the other. The Department has discretion to make or not to make the disclosure. Presumably, the information sought would be more readily accessible at the county board level, the level at which the Department's lower echelons and the recipients have direct contact, rather than at the higher state level. Thus the Department has been empowered to refuse, if it wishes, to deal with requests for information which is more readily available under *mandatory* procedures at the county board level.[8] These are deliber-

---

[8] The Department's regulations do not forbid disclosure by county boards of the information in question. In fact, the applicable regulation provides that if the county board is satisfied that

atetly discrete provisions. I cannot agree with a construction which would read the word "may" as obliterating, by implication, a later appearing "shall." Such an ignoring of the plain meaning of words is precisely what an *in pari materia* construction is designed to avoid.

(d) *"Adult Resident"*

The Court holds, without citation to authority and yet again without the question having been raised, that "no one would seriously suggest that the Philadelphia Newspapers, Inc. is an 'adult resident' of Pennsylvania." To the contrary, I do suggest, and seriously, that indeed the appellee corporation is an "adult resident" of this State and is entitled to the access provided by the two sections of the Public Welfare Code of 1967 here involved. The Legislature has directed that "unless the context *clearly* indicates otherwise," the word "person" is to be taken to include a "corporation, partnership and association." Statutory Construction Act of 1972, Act of December 6, 1972, P. L. 1482, §1991. That was also the rule at common law. *Klein v. Tax Supers,* 282 U.S. 19, 75 L. Ed. 140 (1930) ; *McKinley v. Wheeler,* 130 U.S. 630, 32 L. Ed. 1048 (1889). The word "citizen" has similarly been construed to include private corporations where the context required. *Oneida v. County Forest Preserve Council v. Wehle,* 309 N.Y. 152, 128 N.E. 2d 282 (1955) ; *Sioux Falls Taxpayers Ass'n v. Sioux Falls,* 69 S.D. 93, 7 N.W. 2d 136 (1942). And, of course, constitutional provisions employing the word "person" or "citizen" have been interpreted to include, when the occasion required it, private corporations.

---

the purpose of an inquiry is not commercial or political and the person making the request is over 21, then "the address and amount of assistance . . . *are* disclosed . . . ." Pennsylvania Department of Public Assistance Regulations §4143.31 (emphasis added).

See, e.g., *Pierce v. Society of Sisters*, 268 U.S. 510, 69 L. Ed. 1070 (1925); *Kentucky Finance Corp. v. Paramount Auto Exch. Corp.*, 262 U.S. 544, 67 L. Ed. 1112 (1923).

It would appear to me that an "adult resident" is a "person" who (or which) possesses two identifying attributes: (1) maturity, and (2) permanent location in Pennsylvania. The appellee *Inquirer* lacks neither quality, and therefore, in view of the legislative direction that we regard statutes as speaking to both artificial as well as natural persons "unless the context *clearly* indicates otherwise", must be taken as meeting the requirements of the statute.

It seems to me quite incongruous for the Court to go out of its way to construe statutes regulating access to *public records* in such a way as to exclude *newspapers*. Public welfare today comprises 16% of the annual general fund budget of the Commonwealth. Even more so than in the 1930s when government first undertook direct relief, it is definitely big business, involving half a billion dollars of Pennsylvania taxpayers' money and eight hundred thousand recipients.[9] One may well ask who, if not the news media, would have incentive or resources to undertake an analysis of this area of the operation of our State government. The exclusion of *newspapers* from the sections of the Public Code of 1967 at issue here is tantamount to the exclusion of the *public*.[10]

. . .

[9] Contributions from the federal government to public assistance programs in Pennsylvania total another half billion dollars.

[10] One is reminded of the high priority which Thomas Jefferson placed upon the right of the public to be informed by the press: "The basis of our government being the opinion of the people, the very first object should be to keep that right; and were it left to me to decide whether we should have a government without news-

I am in agreement with that part of the opinion of the Court which holds that *The Inquirer* is not entitled under either our State's constitution or under the federal constitution to compel production of the information it seeks here. I do wish to emphasize, however, that the Court has expressly and properly avoided deciding whether the disclosures sought by the appellees, were they permitted under the Right-To-Know Act, would violate constitutional rights of privacy of the recipients of public assistance. The majority is clearly wrong, however, when it says that "[t]he Legislature . . . wisely avoided this constitutional challenge." For even under the majority's interpretation of sections 404 and 425 of the Public Welfare Code of 1967, an "adult resident" can, by offering names, learn the identity of recipients of public assistance and the amounts thereof. His doing so would set the stage for constitutional confrontation on the privacy issue undecided by today's opinion.

Mr. Chief Justice JONES joins in this dissenting opinion.

---

papers, or newspapers without a government, I should not hesitate a moment to prefer the latter." Letter from Thomas Jefferson to Colonel Edward Carrington, January 16, 1787, quoted in J. Bartlett, Familiar Quotations 373b (1955).