Pete WILLIAMS, News Director of KTWO Radio and Television, Philip Noble, News Correspondent for KTWO Radio and Television, and Harriscope Broadcasting Corporation, d/b/a KTWO Radio and Television, Petitioners,

v.

Honorable Nena R. STAFFORD, Justice of the Peace in and for Sweetwater County, Wyoming, Respondent,

and

John J. Rooney, Attorney General for the State of Wyoming, Robert L. Bath, County and Prosecuting Attorney for Sweetwater County, Wyoming, and Edward Cantrell, Impleaded Respondents.

No. 5009.

Supreme Court of Wyoming.

Jan. 11, 1979.

Claude W. Martin, of Brown, Drew, Apostolos, Massey & Sullivan, Casper, appeared in oral argument on behalf of petitioners.

There was no appearance at oral argument on behalf of respondent.

Gerald A. Stack, Deputy Atty. Gen., Crim. Div., appeared in oral argument on behalf of John J. Rooney, Atty. Gen., impleaded respondent.

There was no appearance at oral argument on behalf of Robert L. Bath, impleaded respondent.

Robert E. Pfister, Lusk, appeared in oral argument on behalf of Edward Cantrell, impleaded respondent.

Before RAPER, C. J., and GUTHRIE,* McCLINTOCK, THOMAS and ROSE, JJ.

ROSE, Justice.

On July 17, 1978, Edward L. Cantrell was given an initial hearing before the Justice of the Peace in and for Sweetwater County, Wyoming, on the charge of murder in the first degree. During the course of these proceedings, which were held in open court, the Justice of the Peace considered but denied bail to the defendant. The attorney for the defendant then moved that the question of bail be reviewed in accordance with Rule 8, W.R.Cr.P., whereupon the Justice of the Peace indicated that she would be willing to discuss the matter in chambers after adjournment of the initial hearing. Apparently such a discussion was held, but no record was made of this meeting. The Justice of the Peace and the prosecution and defense attorneys then returned to the courtroom to review the bail question. Before considering the bail question, defense counsel moved that everyone, except the

---

* At the time of oral argument, while this case was under advisement and at the time a decision was reached, Guthrie, J., was Chief Justice. He retired from the Court on December 31, 1978. By order of the Court, entered on January 1, 1979, he has been retained in active judicial service pursuant to Article 5, Section 5, Wyoming Constitution, and Section 5–1–106(f), W.S.1977.

attorneys, the defendant, law enforcement officers and potential bondsmen, be excluded from the courtroom to avoid prejudice to the defense or the prosecution. The prosecuting attorney offered no resistance to the motion, whereupon the courtroom was cleared. The bail issue was then addressed and, again, the defendant was denied bail.

On July 24, 1978, the petitioners moved this court to issue a writ of prohibition commanding the Justice of the Peace to make available for public inspection all records of the closed bail-review proceeding. In response, the court entered an order directing the Justice of the Peace to either disclose these records or show cause why they should not be made available for public inspection. The Justice of the Peace answered, alleging that this court lacked jurisdiction over all proper parties, that the review of bail was not a public judicial proceeding, or, in the alternative, that closure was warranted to protect the defendant's right to a fair trial. In response, we issued an order requiring joinder of all proper parties and identified certain issues the court wanted the parties to consider. Briefs were submitted on these various issues and arguments were made orally to the court on October 20, 1978. Having fully considered all relevant questions presented, we will deny the relief requested by petitioners, but we will establish standards for future similar cases.

The primary issue in this extraordinary proceeding is whether the records of the closed bail-review proceeding should be opened for public inspection. Before considering that question, we find it necessary to address several collateral matters.

## WRITS OF PROHIBITION AND MANDAMUS

■ Petitioners have asked this court to issue a writ of prohibition, declaring the respondent's order of closure null and void and directing her to take no further action to exclude the public from proceedings which, they contend, must be held in open court. The function of a writ of prohibition is to prevent action and not to undo that which has already been done. *State ex rel. Powell v. Ilsley*, Wyo., 387 P.2d 676, 677 (1963); and *State ex rel. Mau v. Ausherman*, 11 Wyo. 410, 72 P. 200, 214, rehearing denied 73 P. 548 (1902). It is also important to note and emphasize that, other than in exceptional or extraordinary circumstances, the writ of prohibition is only available if the lower court does not have subject-matter jurisdiction or, having such jurisdiction, it exceeds the scope thereof. *State ex rel. Weber v. Municipal Court of the Town of Jackson*, Wyo., 567 P.2d 698, 699 (1977).

■ Writs of Mandamus, on the other hand, may direct an inferior tribunal to exercise its judgment but it may not control judicial discretion. Section 1–30–102, W.S. 1977. The function of mandamus is to command the performance of a ministerial duty which is plainly defined and required by law. Section 1–30–101, W.S.1977; and *LeBeau v. State ex rel. White*, Wyo., 377 P.2d 302, 303 (1963). See, *Philadelphia Newspapers, Inc., v. Jerome*, 478 Pa. 484, 387 A.2d 425, 429, fn. 11 (1978), U.S. appeal pending 434 U.S. 241, 98 S.Ct. 546, 54 L.Ed.2d 506. The primary questions in this case, then, are two, namely, does the Justice of the Peace have a clear duty to release the records of the closed bail-review proceedings, and secondly, do the petitioners have a clear legal right to inspect these records? It would seem, therefore, that the writ of mandamus would be the more appropriate remedy, if any remedy is in fact justified. Still, this court does have the power to grant proper relief, in the form of mandamus, when a party improperly requests a writ of prohibition without objection. *Steward v. Judge of the 15th Judicial District*, Okl., 542 P.2d 945, 947 (1975). We could, therefore, grant a writ of mandamus, even though prohibition has been asked, providing the petitioners have shown a clear entitlement to such relief.

■ Rule 16, Rules of the Supreme Court, requires that any application to this court for a writ of mandamus must disclose why it is necessary for such a writ to issue originally from this court. See, *State v. Copenhaver*, 76 Wyo. 326, 301 P.2d 1066,

1067 (1956). Petitioners urge, as their justification for seeking a writ, that a uniform standard concerning the issues presented in this case is needed, and that this court should make and enter the requested order under its supervisory power over the justice of the peace courts under Article 5, § 2, of the Wyoming Constitution. We accept those arguments for the purposes of this case only but, in the same breath, we direct that similar proceedings in the future should be brought first before a lower court whenever possible. In addition, and consistent with our discussion hereafter, we note that since a lower court does have authority to close pretrial hearings under certain circumstances, a test of the court's jurisdiction to do so through an application for writ of prohibition is inappropriate. The issuance of such a writ is closely guarded so as not to disrupt, unless absolutely necessary, the usual course of judicial proceedings. *State ex rel. Weber v. Municipal Court of the Town of Jackson*, supra, at 700.

Returning, then, to the merits of this case, we will consider the following matters:

1. The appropriate standards for closure of pretrial proceedings, and
2. Whether dissemination of information from this pretrial proceeding would be proper.

## STANDARDS FOR CLOSURE

Petitioners urge, in essence, that the respondent's closure order constituted a prior restraint upon freedom of speech in violation of the First Amendment to the United States Constitution, and restricted their access to court proceedings in violation of the Sixth Amendment to the United States Constitution and Article 1, § 8, of the Wyoming Constitution.

It is important, at the outset, to properly characterize the respondent's order. A *prior restraint* prevents publication of information *in the possession of the press* and is presumed unconstitutional. *Philadelphia Newspapers, Inc., v. Jerome*, supra, citing *Oklahoma Publishing Co. v. District*, 430 U.S. 308, 97 S.Ct. 1045, 51 L.Ed.2d 355 (1977), and *Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 96 S.Ct. 2791, 49 L.Ed.2d 683 (1976). See, ABA Standards Relating to the Administration of Criminal Justice, Fair Trial and Free Press, Standard 8–3.1 (Second Edition Tentative Draft, 1978). Here, the press was not prevented from publishing information in their possession. It was their *access* to the information which was restricted. The United States Supreme Court has never held that the First or Sixth Amendments create an absolute right to access to all court proceedings or to all information in the possession of the courts. *Philadelphia Newspapers, Inc., v. Jerome*, supra; and *Gannett Pacific Corp. v. Richardson*, Haw., 580 P.2d 49, 55 (1978).

■ It is also important to note that the petitioners do not occupy a special status distinct from that of the public. Their right to be present derives from their status as members of the public. *Gannett Pacific Corp. v. Richardson*, supra, at 54, and cases cited therein. Nevertheless, the question of access must be addressed with care and from the proper perspective.

■ There is almost universal agreement among the courts, which have considered the right-of-access issue, that access to court proceedings should be limited only in exceptional circumstances. See *Gannett Pacific Corp. v. Richardson*, supra; *Philadelphia Newspapers, Inc. v. Jerome*, supra; and *Keene Publishing v. Keene District Court*, N.H., 380 A.2d 261 (1977). The reason for requiring all court proceedings to be open, except where extraordinary reasons for closure are present, is to enhance the public trust and confidence in the judicial process, and to insulate the process against attempts to use the courts as tools for persecution. *Gannett Pacific Corp. v. Richardson*, supra. We find that the standard suggested by the American Bar Association's Standing Committee on Association Standards for Criminal Justice represents the most acceptable approach to the right-of-access problem. Standard 8–3.2, supra, provides:

"Except as provided below, pretrial proceedings and their record shall be open to the public, including representatives of the news media. If at the pretrial proceeding testimony or evidence is adduced that is likely to threaten the fairness of a trial, the presiding officer shall advise those present of the danger and shall seek the voluntary cooperation of the news media in delaying dissemination of potentially prejudicial information by means of public communication until the impaneling of the jury or until an earlier time consistent with the fair administration of justice. The presiding officer may close a preliminary hearing, bail hearing, or any other pretrial proceeding, including a motion to suppress, and may seal the record only if

"(i) the dissemination of information from the pretrial proceeding and its record would create a clear and present danger to the fairness of the trial, and

"(ii) the prejudicial effect of such information on trial fairness cannot be avoided by any reasonable alternative means.

"The defendant may move that all or part of the proceeding be closed to the public (including representatives of the news media), or, with the consent of the defendant, the presiding officer may take such action sua sponte or at the suggestion of the prosecution. Whenever under this rule all or part of any pretrial proceeding is held in chambers or otherwise closed to the public, a complete record shall be kept and made available to the public following the completion of trial or earlier if consistent with trial fairness."

To this standard we would add several further requirements.

■ The portion of the pretrial proceeding involved in the determination of closure shall, itself, be closed to the public. Otherwise, there would be no meaningful way of ascertaining whether or not the failure to close the pretrial proceeding would create a "clear and present danger to the fairness of the trial," nor would there be an effective way of deciding whether or not there exists a reasonable alternative to closure. A record of this preliminary determination shall be kept, and the factual basis for the determination upon which closure is predicated shall be made apparent therein. Of course, if a decision not to close the pretrial proceeding is rendered, then this record shall be made available to the public in the normal course of the court's business. See, *Gannett Pacific Corp. v. Richardson*, supra, at 57.

### DISSEMINATION

If the primary question in this case was whether or not there is sufficient evidence *of record* upon which to predicate a closure of the pretrial proceeding, we would have little difficulty in declaring the respondent's closure null and void. See, *Gannett Pacific Corp. v. Richardson*, supra; and *Keene Publishing v. Keene District Court*, supra. The fact is that no record was made as to the basis for closure determination. But the pretrial proceedings were closed and they have already been held. Given these circumstances, it would serve no good purpose to order that a new bail-review hearing be conducted. It would also be inappropriate to remand the case to the lower court for an after-the-fact determination as to whether a failure to close the pretrial proceeding would have created a clear and present danger to the fairness of the defendant's trial.

The problem here, then, is, not whether the closure order can be remedied, but, rather, whether we should now order the *disclosure* of the information which was adduced at the closed proceeding. Indeed, we envision that disclosure will, in all probability, be the primary, if not the only, question to be decided in similar future cases. It will arise in various ways. For instance, where a foundation has been laid for a closed pretrial hearing and the court goes on to close the proceeding, it may find that the evidence which is adduced does not in fact constitute a clear and present danger to the defendant's fair-trial rights. In such a case, the court would and should release the record of the proceedings to the public.

Where, however, the evidence elicited at the closed hearing would, in the opinion of the court, jeopardize the fair-trial rights of the defendant under the standards herein established, then the lower court could and would properly order the record sealed until those rights have been determined to no longer be in jeopardy. When the record is sealed, and there is a challenge to the court's order by a representative of the public, then, subject to appellate review, the district court, if the proceeding had been held in a minor court, or this court, if the proceeding had been originally heard in the district court, must determine whether the originating court had abused its discretion when it ordered the record sealed.

The resolving of this issue, when the defendant has yet to proceed to trial, involves the delicate balancing of the public's right of access to information, on the one hand, and the defendant's right to a fair trial on the other.

We have discovered no other case which has been so directly confronted with this intricate balancing problem. In *United States v. Cianfrani*, 3 Cir., 573 F.2d 835 (1978), the court found there could be no prejudice to the defendant resulting from the release of the entire sealed transcript. In *Cianfrani*, however, the defendant had already pleaded either guilty or nolo contendere to the charges, and portions of the sealed record had already been placed in the public record. As a result, there was no occasion to consider whether the defendant's right to a fair trial under the Sixth Amendment might justify the sealing of portions of the pretrial proceedings. 573 F.2d at 860. See, *Philadelphia Newspapers, Inc., v. Jerome*, supra, 387 A.2d at 434, fn. 19. In another case not directly involving a defendant's right to a fair trial, it was suggested that defendants who were still in jeopardy could be protected and the public's right to access satisfied by affording access to transcripts redacted to exclude matters ruled inadmissible during a closed suppression hearing. *Gannett Co., Inc., v. DePasquale*, 43 N.Y.2d 370, 401 N.Y.S.2d 756, 372 N.E.2d 544 (N.Y.Ct.App.1977), cert. granted, 435 U.S. 1006, 98 S.Ct. 1875, 56 L.Ed.2d 387 (orally argued November 7, 1978), citing *Department of Air Force v. Rose*, 425 U.S. 352, 96 S.Ct. 1592, 48 L.Ed.2d 11 (1976).

We conclude that neither of these solutions is satisfactory in the instant matter because, as we have indicated above and again emphasize, *the function of a reviewing court in dissemination cases is to determine whether there has been an abuse of discretion*, and, since no standards had been established when the Justice of the Peace acted in this case, it cannot, therefore, now be said that she abused her discretion. In short, when the Justice of the Peace rendered her closure decision, there were no extant standards to either guide her or against which we, as a reviewing court, can test her discretion.

Because she had no guidance, the Justice of the Peace, understandably, made no record determination following the closed bail-bond proceeding, to the effect that material presenting a clear and present danger to the fairness of the defendant's trial had been adduced. This being so, there is now no way that we can exercise proper appellate judgment on the issue of abuse of discretion. When questions of this nature arise in the future, this court should not and will not make the initial determination of whether there is or is not record material which presents a clear and present danger to a fair trial for the defendant. This task must be performed in the justice or district court—depending upon where the matter originates.

Under the circumstances of this case of first impression, made unique by the lack of standards against which to test the Justice's discretion, we hold that the rights of the defendant here can be best protected by ordering the record to remain sealed until after the defendant's trial or until such earlier time as a release would be consistent with trial fairness. See *Philadelphia Newspapers, Inc., v. Jerome*, supra, 387 A.2d at 433, citing *McMullan v. Wohlgemuth*, 415 U.S. 970, 94 S.Ct. 1547, 39 L.Ed.2d 863 (1974), dismissing for want of substantial question, 453 Pa. 147, 308 A.2d 888 (1973).

In this particular case, the public's right of access to the information in question is doubly insured by reason of the fact that this holding is consistent with the affirmative response of petitioners' counsel when he was asked at oral argument whether such a disposition as this would fairly respond to petitioners' basic demands.

The peremptory order of this court, commanding the respondent to open the bail-review hearing records to the public, entered July 28, 1978, is vacated, and the relief requested by the petitioners is denied. In accordance with the standards established in this opinion, a complete record of the bail-review hearing shall be kept and made available to the public following the completion of trial, or sooner if the trial court were to find that earlier release is consistent with trial fairness.

RAPER, Chief Justice, dissenting.

I dissent.[1]

The majority evades the real issue in this case for superficial reasons unfamiliar to me in a legal sense: first, they maintain that because there was no record kept of the chamber discussions preliminary to the closed hearing which was reported, the reported proceeding should be impounded; secondly, they assert that the Justice of the Peace had no standards to follow because this court had set none, and therefore she had no discretion to abuse.

What was not reported but should have been is not available. There is available a transcript of the actual hearing. It is the material which has been reported and recorded on tape that the petitioners seek to have released. This court can act only upon what is in existence in the situation before us. If the closure order turns out to be ill-conceived because the justification for closure did not materialize, then no reason exists to keep secret what did transpire and is available.

Section 1–30–102, W.S.1977, provides:

"The writ [Mandamus] can only be issued by the supreme court or the district court. It may require an inferior tribunal to exercise its judgment or to proceed to discharge any of its functions but it cannot control judicial discretion." (Bracketed material supplied.)

That section is an adoption of the common law. It does not authorize an abuse of discretion; the majority misconceives its meaning. It does not authorize an inferior tribunal to act arbitrarily or willy-nilly under the guise of discretion—to abuse discretion. The great weight of authority is to the effect that an exception to the general rule that discretionary acts will not be reviewed or controlled exists when the discretion has been abused, if the facts otherwise justify the issuance of a writ of mandamus. 55 C.J.S. Mandamus § 73, p. 128. Judicial discretion never authorizes arbitrary action that tends to defeat the ends of justice. If the action of a judge amounts to an abuse of discretion, there is no other available remedy and the exigency is such as to justify interference under the superintending power of the higher court, then mandamus to compel proper action should be taken. 52 Am.Jur.2d, Mandamus, § 311, p. 639.

*LeBeau v. State,* Wyo.1963, 377 P.2d 302, cited by the majority does not involve a higher court mandating a lower court nor does it deal with abuse of discretion. The legalistic phrase "abuse of discretion" is not as harsh as the word "abuse" might seem to relate. It does not infer any reflection

1. I agree with some of the holdings of the majority. Mandamus is the more appropriate remedy and the court may consider the filing of such and grant it even though a writ of prohibition has been requested. For the reasons stated in the majority opinion, future proceedings such as this should be brought first before the appropriate district courts, pursuant to Rule 16, Rules of the Supreme Court. I would also acknowledge the supervisory jurisdiction of this court over Justices of the Peace pursuant to § 2, Art. V, Wyoming Constitution but would add that final authority to do so must come from the legislature. Section 5–4–207, W.S. 1977, implements the constitutional provision: "The supreme court of Wyoming is hereby vested with supervisory powers over the justice courts of the state of Wyoming . . . ." Any further agreement with any views expressed in the court's opinion will be covered as appropriate.

upon the judge charged with abuse, nor carry with it any implication of conduct deserving censure. It is but a strict legal term used to indicate that the appellate court is simply of the opinion that there was the commission of an error of law under the circumstances, *Eager v. Derowitsch,* 1951, 68 Wyo. 251, 264, 232 P.2d 713; *Puterman v. Puterman,* 1949, 66 Wyo. 89, 205 P.2d 815. It is a discretion exercised to an end or purpose not justified by, and clearly against, reason and evidence. In other words, the evidence before this court must show that the conclusion of· the acting agency was wrong and unreasonable. *Howard v. Lindmier,* 1950, 67 Wyo. 78, 214 P.2d 737. And that is exactly the situation we here confront.

It is a singularly and innovative approach that the majority now utilizes which is not in keeping with our usual lack of hesitancy not only to point out but to correct errors of justice or any other court, even where we have not fixed precise standards. It appears that the majority's compassion for lack of knowledge and an absence of teaching by this court is now a ground for affirmance. While I can understand an expression of sympathy, it has never before stood in the way of rectifying error. Dealing with new and difficult questions does not relieve any court of the responsibility of proper disposition. Appellate courts are available to correct erroneous conclusions and that is what this court should do in the proceeding before it.

I cannot find in the majority opinion any indication that this court, *in camera,* listened to the bail bond proceeding tape. The court prefers to rest upon the basis of what it did not hear. We did listen to the taped recording, and I was frankly amazed at its innocuity. I had prepared a transcript of the proceeding in order to examine each word and phrase in its totality. I

conclude we have in our hands a tempest in a teapot. In my examination of the transcript, I found only two statements out of several pages that could, under any standard, be considered as jeopardizing the defendant's fair trial rights; and they were not the proper subject matter of a bail bond hearing. I would require that the entire transcript be released.

I think we can and must assume that representations were made at the unreported conference that the bail bond hearing would disclose evidence which would jeopardize the fair-trial rights of the defendant. This is justified under Standard 8–3–2, Fair Trial and Free Press of Standards Relating to the Administration of Criminal Justice, an American Bar Association project, which the majority adopts. I would point out that the cited standard is an amended version of the original, and is only tentative and not finally approved. It was adopted as a tentative suggested standard in the summer of 1978, as a result of the influence of *Nebraska Press Ass'n v. Stuart,* infra. My experience is that such tentative standards do not become final for about one year. That standard may undergo some changes when the Supreme Court of the United States hands down its decision in *Gannett Co., Inc. v. DePasquale,* 1977, 43 N.Y.2d 370, 401 N.Y.S.2d 756, 372 N.E.2d 544, cert. granted 435 U.S. 1006, 98 S.Ct. 1875, 56 L.Ed.2d 387, orally argued in November 1978, 47 L.W. 3325, cited by the majority, which should meet head on the issue of closure of pretrial proceedings.[2]

In any event, assuming that the ABA Standard is the last word, this court does not follow it. Getting back to the reported hearing or conference, whatever it was, the record may be sealed only if:

"(i) the dissemination of information from the pretrial proceeding and its record would create a clear and present danger to the fairness of the trial, and

2. I also question the finality as authority of *Philadelphia Newspapers, Inc. v. Jerome,* 1978, 478 Pa. 484, 387 A.2d 425, because there is presently pending in the Supreme Court of the United States a jurisdictional statement under that title, case No. 78–155 praying that if the Supreme Court consider the appeal improvi-

dently taken (See *Philadelphia Newspapers, Inc. v. Jerome,* 1978, 434 U.S. 241, 98 S.Ct. 546, 54 L.Ed.2d 506) that the jurisdictional statement be considered as a petition for certiorari. At the time of this opinion, the Supreme Court had not yet acted in that regard.

"(ii) the prejudicial effect of such information on trial fairness cannot be avoided by any reasonable alternative means."

What are the reasonable alternative means? The majority does not mention them. The commentary to the standard does:

". . . The standard does not enumerate possible procedural alternatives, but the effectiveness of the following should receive serious consideration: (1) continuance, (2) severance, (3) change of venue, (4) change of venire, (5) intensive voir dire, (6) additional peremptory challenges, (7) sequestration of the jury, and (8) admonitory instructions to the jury.[8]"

Footnote 8 to the quotation points out that the Supreme Court of the United States in *Nebraska Press Ass'n v. Stuart*, 1976, 427 U.S. 539, 562–565, 96 S.Ct. 2791, 2805, 49 L.Ed.2d 683, 701, discussed several of those measures. I will discuss their imperative significance later. At this juncture, I only assume that the respondent Justice of the Peace considered those alternatives. She had available information as to their importance in *Nebraska Press Ass'n,* published in 1976, and was as charged with the responsibility of considering that case as is this court.

Whatever was represented to the Justice of the Peace in the unreported conference to justify closure certainly is not reflected in the actual closed reported hearing. There is not only no "clear and present danger" to a fair trial, but also there is no indication that the information even need be considered in connection with the alternatives, though I have done so with respect to the two questioned sentences.

In *Nebraska Press Ass'n*, the Supreme Court left open issues relating to the validity of closing pretrial proceedings with the consent of the defendant. This indicates that there probably are identifiable differences between restraints on those in attendance at open hearings and closure of access to court proceedings. In some instances there probably are differences, such as adoption proceedings, § 1–22–104, W.S.1977, proceedings under the Juvenile Court Act,

§§ 14–8–10 et seq., W.S.1977, and proceedings pursuant to the Uniform Parentage Act, § 14–7–111, W.S.1977, where privacy of personal matters and other social consideration justify such action. I have no doubt but that some extreme situations will require very limited closure in criminal cases. Anno., Exclusion of public during criminal trial, 48 A.L.R.2d 1436 and Later Case Service. For the moment, I am willing to accept the American Bar Association Standard as suitable, when properly applied. However, it does not carte blanche license closures.

There are at least three federal constitutional questions that come into play and collide with each other when we undertake a consideration of court closure: First Amendment, ". . . [1] *freedom . . . of the press . . .*" protected by the Fourteenth Amendment; Sixth Amendment: "In all criminal prosecutions, the accused shall enjoy the right to a speedy and [2] *public trial,* [3] by an *impartial* jury . . ." also protected by the Fourteenth Amendment. (Bracketed material and emphasis supplied.) The Wyoming Constitution expresses those rights in a somewhat different fashion. The words "freedom of the press" do not appear but are embraced by § 20, Art. I, Wyoming Constitution, "Every person may freely speak, write and publish on all subjects, being responsible for the abuse of that right . . .." The matter of a public trial is covered by § 8, Art. I, Wyoming Constitution, "All courts shall be open . . ." and the right to an impartial jury appears in § 10, Art. I, Wyoming Constitution, ". . . the accused shall have the right . . . to a speedy trial by an impartial jury . . .." Whether we speak in terms of the Constitution of the United States or the Constitution of the State of Wyoming, we can say with a reasonable degree of assurance that the rights granted substantially parallel each other.

As pointed out in *Nebraska Press Ass'n,* the authors of the Bill of Rights did not undertake to assign priorities as between First and Sixth Amendment rights, ranking

one as superior to the other; and the court declined to rewrite the constitution by undertaking to do so. I question the position of the majority in the case now before us when it attempts the job of "delicate balancing of the public's right of access to information on the one hand, and the defendant's right to a fair trial on the other." I cannot see that it has balanced anything but has weighted the scales in favor of the defendant's right to a fair trial by refusing to even consider the effect of the material appearing in the reported proceeding.

In the *Nebraska Press Ass'n* case, the Supreme Court made it clear that the record was devoid of any showing that alternative measures would not have protected the defendant or even that such alternative measures were considered. There is likewise such an absence here. The Court then summarized its reasons for reversal of the prior restraint order by stating that the record before it

". . . it is not clear that further publicity, unchecked, would so distort the views of potential jurors that 12 could not be found who would, under proper instructions, fulfill their sworn duty to render a just verdict exclusively on the evidence presented in open court. We cannot say on this record that alternatives to a prior restraint on petitioners would not have sufficiently mitigated the adverse effects of pretrial publicity so as to make prior restraint unnecessary. Nor can we conclude that the restraining order actually entered would serve its intended purpose. Reasonable minds can have few doubts about the gravity of the evil pretrial publicity can work, but the probability that it would do so here was not demonstrated with the degree of certainty our cases on prior restraint require." 96 S.Ct. at 2807.

The majority sees a difference between a "prior restraint" which restricts publication "in the possession of the press" and restriction from "access" by closure. I see very little, if any, difference between not letting the news media into the courtroom, and permitting them to watch and listen but telling them they cannot publish what they see and hear. However said, prior restraint or closure muzzles a free press.[3]

I am attracted to the verities expressed in the separate concurring opinion of Justice Brennan. After stating that the right to a fair trial and the right of freedom of the press secure equally fundamental rights, he describes the important role of the press in the jurisprudence of this country. Through paraphrasing and the omission of citations, there available, I think his expression is worthy of repeating as consistent with my views and which I am satisfied ought to form the backdrop for the disposition of this case.

A responsible press has always been regarded as the "handmaiden" of effective judicial administration in the criminal field. The press not only publishes information about trials, but protects the administration of justice by subjecting police, prosecutors, and judicial processes to extensive public scrutiny and criticism. Commentary on and reporting about the operation of the criminal justice system is at the core of First Amendment values of preserving the integrity of that system and is crucial to citizens concerned with government. Secrecy of judicial action breeds ignorance and distrust of courts and suspicion concerning the confidence and impartiality of judges. Free reporting, criticism and debate contribute to a public understanding of the rule of law and a comprehension of the criminal justice system. It also improves the quality of that system by subjecting it to the cleansing effect of exposure and public accountability; sunlight has a disinfecting quality. The Sixth and First Amendments cannot be subordinated, one to the other.

---

**3.** In *CBS, Inc. v. Young,* 6th Cir. 1975, 522 F.2d 234, the district court restrained all parties to the litigation, their relatives, close friends and associates from discussing the cases in any manner whatsoever with members of the news media or the public. The circuit court held it constitutionally impermissible and issued a writ of mandamus. The court used the term "prior restraint" to describe the prohibited access.

Restraints are, in fact, censorship; and our distaste for censorship arising from the attitude of a free people is deeply written into our law. A free society prefers to punish the few who abuse rights of speech rather than to throttle them, and all others, beforehand. The risks of freewheeling censorship are formidable. Any system of restraints of expression comes to the court bearing a heavy presumption against its constitutional validity.

The effect of pretrial publicity on prospective jurors is at best speculative, and there are devices available for screening from jury duty those individuals who have in fact been exposed to prejudicial pretrial publicity. When we start down the path of speculative censorship, judges at all levels are being interjected inappropriately as censors of material having an unknown effect. The incentives and dynamics of the system of prior restraints will inevitably lead to over-employment of the technique. It seems particularly true that in order to minimize pretrial publicity against a client and prevent ineffective-assistance-of-counsel claims, counsel for defendants might routinely seek such restrictive orders. Prosecutors would often acquiesce in such motions to avoid jeopardizing a conviction on appeal. And although judges can readily reject many such claims as frivolous, there would be a significant danger that judges would nevertheless be predisposed to grant the motion, both to ease their task of insuring fair proceedings and to insulate their conduct in the criminal proceeding from reversal.

Further, there is the specter of floodgates of litigation that would be a drain on the media, if they elected to contest every restraint. Economic concerns alone would discourage exercise of the right to contest even blatantly unconstitutional restraints. As a result, newspapers and other media would avoid crime coverage, with concomitant harm to the public's right to be informed of such proceedings. As in this case, judicial review is often inadequate, since the delay inherent in judicial proceedings destroys contemporary news value of the information the press seeks to disseminate.

*United States v. Cianfrani,* 3rd Cir. 1978, 573 F.2d 835, involves more than the majority recognizes. It deals specifically with the question of closure. Even though the defendant had entered a plea of guilty or nolo contendere and parts of the record had already been released, the court still dealt with the question in spite of the termination of the underlying prosecution because parts of the record were still sealed—hidden from public view; furthermore, the court concluded that a controversy capable of repetition would evade review if not considered, citing *Nebraska Press Ass'n v. Stuart,* supra, 427 U.S. at 546–547, 96 S.Ct. at 2797, 49 L.Ed.2d at 690, in which the lower court's restraints had expired by their own terms upon selection of a jury. The Supreme Court

"... recognized, however, that jurisdiction is not necessarily defeated simply because the order attacked has expired, if the underlying dispute between the parties is one 'capable of repetition, yet evading review.' *Southern Pacific Terminal Co. v. ICC,* 219 U.S. 498, 515, 31 S.Ct. 279, 283, 55 L.Ed. 310 (1911)." (Footnote omitted.)

The court in *Cianfrani* comprehensively discussed the constitutional aspects of the "public trial" provision of the Sixth Amendment as reflecting both the traditional American distaste for secret hearings and a restraint on the possible abuse of judicial power:

"... publicity is 'of critical importance to our type of government in which the citizenry is the final judge of the proper conduct of public business.' *Cox Broadcasting Corp. v. Cohn,* 420 U.S. 469, 495, 95 S.Ct. 1029, 1046, 43 L.Ed.2d 328 (1975). Every criminal prosecution raises important questions not only about the activities of the accused, but also about the conduct of the police, the prosecution, and the court in the carrying out of public business. And where the prosecution is of a powerful politician for abuse of his public office, the already strong public

interest in observing the proceedings is enhanced." 573 F.2d at 848.

In the case before us, there are compelling reasons to open the proceeding to the public because, according to the open record, the defendant is a high ranking law enforcement officer charged with the murder of another law enforcement officer. It is more important than ever that unusual care be taken to keep the public informed of proceedings at every stage because the integrity of law enforcement and the judicial system is particularly at stake and the public's business.

Any decision to exclude the public from access to the proceedings must be made, mindful that "justice cannot survive behind walls of silence," *Sheppard v. Maxwell,* 1966, 384 U.S. 333, 349, 86 S.Ct. 1507, 1515, 16 L.Ed.2d 600, 613.

The *Cianfrani* court held that

". . . any order of exclusion must extend no farther than the circumstances strictly warrant in order to meet the asserted justification for closure. *United States v. Ruiz-Estrella,* 481 F.2d 723, 725 (2d Cir. 1973). Thus, only that portion of the public may be excluded for only that portion of the proceeding that the court finds to be strictly and inescapably necessary to protect the interests asserted by the defendant in support of his motion to close a hearing subject to the public trial requirement."

The court then proceeded to agree that some protection against disclosure was warranted but, with the exception of material protected under a federal statute,[4] the transcript of the rest of the proceeding should have been ordered released. That is the precise point I make here. There are two sentences in the transcript that might be considered prejudicial but they were not even proper for a bail bond proceeding, and they referred only to an affidavit that was never offered nor became a part of the record. In my estimation, any effect they might have on the public could well be disposed of by the alternatives available, for example, change of venue, vigorous voir dire and admonitory instructions to the jury. "[P]retrial publicity—even pervasive, adverse publicity—does not inevitably lead to an unfair trial." *Nebraska Press Ass'n v. Stuart,* supra, 427 U.S. at 554, 96 S.Ct. at 2800, 49 L.Ed.2d at 695.

The majority opinion in *Nebraska Press Ass'n* in its discussion of the alternatives is worthy of setting out in full:

"Most of the alternatives to prior restraint of publication in these circumstances were discussed with obvious approval in *Sheppard v. Maxwell,* 384 U.S., at 357–362, 86 S.Ct. 1507, 16 L.Ed.2d 600, 6 Ohio Misc. 231, 35 Ohio Ops.2d 431: (a) change of trial venue to a place less exposed to the intense publicity that seemed imminent in Lincoln County; (b) postponement of the trial to allow public attention to subside; (c) searching questioning of prospective jurors, as Mr. Chief Justice Marshall used in the *Burr* case, to screen out those with fixed opinions as to guilt or innocence; (d) the use of emphatic and clear instructions on the sworn duty of each juror to decide the issues only on evidence presented in open court. Sequestration of jurors is, of course, always available. Although that measure insulates jurors only after they are sworn, it also enhances the likelihood of dissipating the impact of pretrial publicity and emphasizes the elements of the jurors' oaths.

"This Court has outlined other measures short of prior restraints on publication tending to blunt the impact of pretrial publicity. See *Sheppard v. Maxwell,* 384 U.S., at 361–362, 86 S.Ct. 1507, 16 L.Ed.2d 600, 6 Ohio Misc. 231, 35 Ohio Ops.2d 431. Professional studies have filled out these suggestions, recommending that trial courts in appropriate cases limit what the contending lawyers, the police, and witnesses may say to anyone. See American Bar Association Project on

---

4.  Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. §§ 2510, et seq.

Standards for Criminal Justice, Fair Trial and Free Press 2–15 (Approved Draft 1968).

\* \* \* \* \* \*

"We have therefore examined this record to determine the probable efficacy of the measures short of prior restraint on the press and speech. There is no finding that alternative measures would not have protected Simants' rights, and the Nebraska Supreme Court did no more than imply that such measures might not be adequate. *Moreover, the record is lacking in evidence to support such a finding.*" (Footnotes omitted and emphasis supplied.)

Likewise, in the case before us there is no finding or evidence such as that required. The best evidence of this is the harmless material actually elicited at the hearing.

The petitioners, in the important matter before us, are at a terrible disadvantage. They do not have available the tapes or a transcript. The court has set aside the usual adversary process which is the heart of the judicial function whereby all sides of the question are permitted to be argued. Petitioners cannot express their views as to how prejudicial any part of the secret hearing might be. They are asked to just trust that the court will do the right thing. We had better be right. It is for that reason, ". . . any claim of practical justification for a departure from the constitutional requirement of a public trial must be tested by a standard of strict and inescapable necessity." *United States, ex rel. Bennett v. Rundle,* 3rd Cir. 1969, 419 F.2d 599, 607.

While counsel for the petitioners, under pressure from the court, may have agreed in oral argument that the tapes could be sealed until the close of the trial, my view is that counsel was agreeable only if they contained matter falling within the strict provisions of the American Bar Association Standard, which he did not have before him. I would not hold him to any agreement, under the circumstances.

After having received the transcript, I could not possibly be a party to a decision to close an empty treasure chest. This expensive litigation has stirred up unnecessary conjecture. It would have been much more satisfactory for the respondent to have played back the tapes to the news media after the hearing disclosed neither material of a nature that "would present a clear and present danger to the fairness of the trial," nor of such doubtful prejudicial effect that prejudice could not "be avoided by any reasonable alternative means." Since it was not done at that level, I would correct the error and mandate release.